**No. 24-6668**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Brian Wright,

*Plaintiff-Appellant,*

v.

Gerardo Talamantes, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. 4:21-cv-00257-JGZ
Hon. Jennifer Zipps

---

### APPELLANT'S OPENING BRIEF

---

Michael Garth Moore (023742)
6336 North Oracle Road Suite 326 #119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com

*Attorney for Appellant Brian Wright*

i

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant, Brian Wright, a natural person, is not required to file a corporate disclosure statement by Rule.

Date: April 4, 2025

/s/ Michael Garth Moore
Michael Garth Moore

Attorney for Appellant Brian Wright

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... ii

TABLE OF AUTHORITIES ................................................................................... v

STATEMENT OF JURISDICTION ......................................................................... 1

ISSUES PRESENTED ............................................................................................. 1

STATEMENT OF THE CASE ................................................................................. 3

    I.    Woolridge conducts a Forensic Medical Examination on the Child..... 3

    II.    DCS Appellees Talamantes and Francisco are Assigned the Hotline Report to Investigate........................................................................................ 8

    III.    Proceedings Below……………………………………………............14

SUMMARY OF ARGUMENT ............................................................................... 16

    I.    APPELLEE WOOLRIDGE: STRIP SEARCH FORENSIC MEDICAL EXAMINATION ................................................................................... 16

    II.    DCS APPELLEES TALAMANTES AND FRANCISCO: JUDICIAL DECEPTION ......................................................................................... 18

ARGUMENT .......................................................................................................... 19

    I.    THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST APPELLEE WOOLRIDGE ON THE FIFTH AND SIXTH CLAIMS, AND IN GRANTING APPELLEE SUMMARY JUDGMENT ON QUALIFIED IMMUNITY ................................................................... 19

        A.    Does a forensic medical examination conducted on a child at the behest of the state and without notice to the parent or a court order authorizing the examination violate both the child and the parent's constitutional rights?.............................................................................................. 19

        B.    Was Appellee acting under color of law?..................................... 22

        C.    May Appellee assert the affirmative defense of qualified immunity? ..................................................................................... 24

        D.    Woolridge is permitted to raise the defense, is he entitled to qualified immunity?.................................................................... 31

    II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES TALAMANTES AND FRANCISCO ON THE SEVENTEENTH AND NINETEENTH CLAIMS ............. 37

A.   Standard of review of the Seventeenth and Nineteenth Claims ... 37

B.   Supervisor Francisco was an integral participant in securing the two orders ................................................................... 40

C.   Is there a genuine issue of material fact as to judicial deception in Appellees' securing the car order? ........................................ 42

D.   Is there a genuine issue of material fact as to judicial deception in Appellees' securing the temporary orders? ......................... 52

CONCLUSION ................................................................................. 56

STATEMENT OF RELATED CASES ................................................. 56

CERTIFICATE OF COMPLIANCE .................................................... 57

CERTIFICATE OF SERVICE ............................................................. 57

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Warner,*
451 F.3d 1063 (9th Cir. 2006) ........................................................... 16

*Ashcroft v. al-Kidd,*
563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ............. 33

*Bartell v. Lohiser,*
12 F. Supp. 2d 640 (E.D. Mich. 1998) aff'd, 215 F.3d 550 (6th Cir. 2000) ................................................................................................... 28

*Beck v. Buckland,*
527 F.3d 853 (9th 2008) ........................................................... 53, 54

*Benavidez v. County of San Diego,*
993 F.3d 1134 (9th Cir. 2021) .................................................... 18, 37

*Berger v. Hanlon,*
129 F.3d 505 (9th Cir.1997) ............................................................. 23

*Bravo v. City of Santa Maria,*
665 F.3d 1076 (9th Cir. 2011) ......................................................... 40

*Butler v. Elle,*
281 F.3d 1014 (9th Cir.2002) .......................................................... 39

*Calabretta v. Floyd,*
189 F.3d 808 (9th Cir. 1999) ........................................................... 31

*Celotex Corp. v. Catrett,*
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ................. 16

*Collins v. Womancare,*
878 F.2d 1145 (9th Cir.1989) .......................................................... 23

*Costanich v. Dep't of Soc. & Health Svc's,*
627 F.3d 1101 (9th Cir. 2010) ............................................. 18, 37, 42

*Demaree v. Pederson*,
    887 F.3d 870 (9th Cir. 2018).................................................... 32, 33

*Dennis v. Sparks*,
    449 U.S. 24 (1980) ........................................................... 22

*Dubbs v. Head Start, Inc.*,
    336 F.3d 1194 (10th Cir. 2003)...................................... 21

*Ewing v. City of Stockton*,
    588 F.3d 1218 (9th Cir.2009).......................................... 38

*Ferguson v. City of Charleston*,
    532 U.S. 67 (2001) ........................................................ 21

*Filarsky v. Delia*,
    566 U.S. 377, 132 S. Ct. 1657, 182 L. Ed. 662 (2012)................... 28

*Galbraith v. County of Santa Clara*,
    307 F.3d 1119 (9th Cir.2002)...................................... 18, 38

*Gasho v. United States*,
    39 F.3d 1420 (9th Cir. 1994).......................................... 39

*Green v. Thomas*,
    __ F.3d ___, 2025 U.S. App. LEXIS 4912 *17-18 (5th Cir., March 3,
    2025)........................................................................ 24

*Greene v. Camreta*,
    588 F.3d 1011 (9th Cir. 2008).................................. 39, 40, 42, 43, 46

*Halvorsen v. Baird*,
    146 F.3d 680 (9th Cir. 1998).................................... 27, 28

*Henry v. United States*,
    361 U.S. 98 (1959) ........................................................ 39

*Hervey v. Estes*,
    65 F.3d 784 (9th Cir.1995)............................................. 42

vi

*Hoggard v. Rhodes*,
    141 S. Ct. 2421 (2021) ...................................................... 24

*Hopkins v. Bonvicino*,
    573 F.3d 752 (9th Cir.2009) .......................................... 39

*Jensen v. Lane County*,
    222 F.3d 570 (9th Cir. 2000).................................. 17, 22, 23, 27, 30

*Jones v. County of Los Angeles*,
    802 F.3d 990 (9th Cir. 2015)........................................ 18, 34, 36, 39

*Liston v. County of Riverside*,
    120 F.3d 965 (9th Cir. 1997)............................................ 39

*Mabe v. San Bernardino County*,
    237 F.3d 1101 (9th Cir. 2001).......................................... 34

*Mann v. County of San Diego*,
    907 F.3d 1154 (9th Cir. 2018).............................................. 17, 20, 21

*Maxwell v. Cnty. of San Diego*,
    708 F.3d 1075 (9th Cir. 2013) ...................................... 40

*McCullum v. Tepe*,
    693 F.3d 696 (6th Cir. 2012)........................................... 28

*Moore v. Garnand*,
    83 F. 4th 743 (9th Cir. 2023) .......................................... 32

*Mullenix v. Luna*,
    577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)
    (per curiam) ....................................................... 32

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020)...................................... 21

*Pearson v. Callahan,*
    555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ................... 31

*Rawson v. Recovery Innovations, Inc.*,
    975 F.3d 742 (9th Cir. 2020) ................................................. 22, 23, 24

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 139, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ............... 16

*Richardson v. McKnight*,
    521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997) ......... 25, 26

*Spencer v. Peters,*
    857 F.3d 789 (9th Cir. 2017) ............................................................. 37

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ........................................................... 40

*Tanner v. McMurray,*
    989 F.3d 860 (10th Cir. 2021) ........................................................... 28

*Taylor v. List,*
    880 F.2d 1040 (9th Cir. 1989) ........................................................... 40

*United States v. Attson*,
    900 F.2d 1427 (9th Cir. 1990) ........................................................... 21

*United States v. Gourde,*
    440 F.3d 1065 (9th Cir. 2006) ........................................................... 38

*United States v. Hove,*
    848 F.2d 137 (9th Cir. 1988) ............................................................. 38

*United States v. Moore*,
    483 F.2d 1361 (9th Cir.1973) ............................................................ 39

*United States v. Sandoval-Venegas*,
    292 F.3d 1101 (9th Cir. 2002) ........................................................... 38

*United States v. Thai Tung Luong,*
    470 F.3d 898 (9th Cir. 2006) ............................................................. 38

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ........................................................ 21

*Wallis v. Spencer,*
    202 F.3d 1126 (9th Cir. 2000) ....................................... 17, 19, 20, 31

*Wright v. S. Arizona Child.'s Advocacy Ctr.,*
    2023 U.S. Dist. LEXIS 42808 at **5-6
    (D. Ariz. March 14, 2023) ........................................... 15, 40

*Wyatt v. Cole,*
    504 U.S. 158, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992) ............... 25

*Yin v. California,*
    95 F.3d 864 (9th Cir. 1996) ........................................... 21

## Statutes

28 U.S.C. § 1291 ........................................................ 1

28 U.S.C. § 1331 ........................................................ 1

42 U.S.C. § 1983 ........................................................ 1, 19, 24

A.R.S §8-801 ........................................................ 5

## Constitution

U.S. Constitution Fourth Amendment……………………………Passim

U.S. Constitution Fourteenth Amendment………………………..Passim

## Treatises

9 A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529 at
    299 (2d ed.1995) ........................................................ 16

## STATEMENT OF JURISDICTION

Brian Wright, individually and as father and legal guardian of L.A.W., a minor, brought suit against the Defendant-Appellees under 42 U.S.C. §1983, alleging, as to Defendant Dr. Dale Woolridge, the performance of a Forensic Medical Examination on the child in violation of the child's Fourth and Fourteenth Amendment rights and Fourteenth Amendment familial associational rights of the father; and against Defendants Gerardo Talamantes and Meghean Francisco, employees of the Arizona Department of Child Safety [hereafter, "the DCS Appellees"] for judicial deception in securing an *ex parte* Court Authorized Removal Order [hereafter, "CAR"] and the filing of a dependency case against Brian Wright resulting in *ex parte* Temporary Orders affirming legal and physical custody of the child in the Department. The District Court had jurisdiction over Mr. Wright's claims under 28 U.S.C. § 1331. Final judgment was entered November 19, 2024, following a grant of summary judgment in favor of Defendants. Doc. 440.

Mr. Wright timely filed a notice of appeal on October 29, 2024. 3 ER 548. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

A.    Did the District Court err in concluding that Appellee Woolridge was not acting under color of law when he conducted an intrusive strip search Forensic Medical Examination [hereafter, "FME"] on the child L.A.W. to collect evidence in

a criminal investigation being conducted by a City of Sahuarita, Arizona Police Department detective?

B.  Did the District Court err in concluding that the FME conducted by Appellee Woolridge, without notice being first given to Brian Wright, comported with the child's Fourth Amendment right to be free of unreasonable searches, and both father and son's First and Fourteenth Amendment right to familial association?

C.  Did the District Court err in concluding that the affirmative defense of qualified immunity was available to Appellee Woolridge?

D.  Did the District Court err in concluding that qualified immunity protected Appellee from liability for conducting the unconstitutional search?

E.  Did the District Court err in concluding, on the Seventeenth Claim, that there was no genuine issue of material fact whether the DCS Appellees Talamantes and Francisco engaged in judicial deception in the application for a Court Authorized Removal Order, which was filed and granted on December 28, 2020, which gave illusory probable cause that *ex parte* removal of the child from Brian Wright's custody was clearly necessary to prevent future abuse?

F.  Did the District Court err in concluding, on the Nineteenth Claim, that there was no genuine issue of material fact that the DCS Appellees engaged in judicial deception in securing *ex parte* Temporary Orders from the juvenile court on December 31, 2020, affirming the temporary legal and physical custody of the child in the Department?

## STATEMENT OF THE CASE

### I.    Woolridge conducts a Forensic Medical Examination on the Child

On the morning of Wednesday, December 16, 2020, Brian Wright's six (6) year old son, L.A.W., is dropped off at Copperview Elementary School in Sahuarita, Arizona, by his step-mother, Irlanda Wright. L.A.W., who is in the first grade, is afflicted with a condition called encopresis, and cannot control his bowel movements. As a result, he is still in diapers – pullups.[1]

Because his condition requires changes periodically, Brian has arranged with the school for the nursing assistant, Jessica Mendez, as a professional mandated under Arizona law to report any suspicion of abuse, to change him when necessary. Ms. Mendez has been doing this task for the better part of two (2) school years and documents each change. Up to the morning of December 16, 2020, she has noticed what she describes as "little boy bruises" when she changes him, but never any mark which causes her to pick up the phone and dial the 1-800 Hotline set up by the Arizona Department of Child Safety ["DCS"].

---

[1] The events at the school and at the Southern Arizona Child Advocacy Center and those of Appellee Woolridge's actions are taken, unless otherwise indicated, from Plaintiffs' Statement of Facts in Support of Plaintiffs' Motion for Partial Summary Judgment, Doc. 285, 2 ER 283-293; Appellee Woolridge's Statement of Facts in Support of Woolridge's Motion for Summary Judgment, Doc. 298, 2 ER 273-279; and  the Sahuarita Police Department Detail Incident Report for S201220504, dated December 20, 2020, Doc. 282-6 [hereafter, "SPD DIR"] 2 ER 323-338. In responding to Mr. Wrights's Motion for Partial Summary Judgment, Doc. 283, Appellant Woolridge conceded the facts, Doc. 296, and did not file a Contradicting Statement of Facts.

This morning, however, when she changes L.A.W. she sees a single mark on the back of his left hamstring in addition to the little boy bruises. She asks him how he got it, but the child answers her that he doesn't know. She consults with another staff member, and they decide to the DCS Hotline and 911 are necessary.

The narrative of the Hotline call to DCS, received at 10:13 a.m., memorialized by the DCS Hotline specialist, reads as follows:

> Today, L came to school with a bruise on the back of his left leg. The bruise is the size of a (sic) inch. The bruise is light at the top and red at the bottom. When asked about the bruise, L deflected and didn't act like he normally does. L put his hoodie over his head and he stated he did not get the bruise from falling. L sometimes comes to school with "little boy bruises". L will usually laugh and say how he got the bruise, like from falling or playing. Today, the police were called out to the school.

2 ER 072-073.

In response to the 911 call, at 10:18 a.m. Officer Carrizosa of the Sahuarita Police Department arrives at the school, followed shortly by Detective Thomas Johnston. Carrizosa and Johnston gather information from Ms. Mendez. Mendez informs Carrizosa that when L.A.W. was earlier questioned about the mark, he responded, "I don't know, I didn't fall." Deborah Ramirez, another staffer, who is also questioned, says she thought the mark looked like it came from a belt, and also informs Carrizosa that there have been no other "issues with the Wright family in the past."

Carrizosa, with the help of Ms. Mendez, meets with L.A.W. and photographs the child's lower limbs partially disrobed, which preserves the evidence of the mark

4

seen by Mendez. She then interviews him. L.A.W. repeats that he didn't know how he got the mark, but he got it yesterday.

When no DCS investigator arrives at the school, Johnston decides to have Carrizosa transport L.A.W. to the Southern Arizona Child Advocacy Center [hereafter, "SACAC"]. The child arrives at the SACAC at approximately 12:00 p.m.

Throughout the 16th, Brian Wright received no notice that his son is in custody nor that he was to be subjected to this examination.

The SACAC operates as one of a number of "partner agencies" under The Pima County Protocols for Multidisciplinary Investigation of Child Abuse [hereafter, "the Protocols" or "PCP's"], 3 ER 402-547. SACAC "provides a one-stop, child-sensitive environment for *the collection of forensic evidence*. …" 3 ER 479 (emphasis added). These "partner agencies" include, among others, DCS, the Pima County Attorney's Office and law enforcement agencies. 3 ER 479-480.

These partner agencies, together, are named the "Multi-Disciplinary Team." The role of the "Multi-Disciplinary Team" (MDT) "is to ensure compliance with the Protocols, which includes "monitoring investigations of criminal conduct (as defined in A.R.S §8-801) to ensure that joint investigation (sic) are done where applicable…." 3 ER 418.

Defendant Woolridge is the Medical Director of the SACAC. There are two Associate Medical Directors who also perform FME's.

The SACAC will accept a case for evaluation at the request of law enforcement or DCS. 3 ER 432. An FME will not be done at the request of a parent. At the behest of law enforcement, the SACAC conducts both Forensic Interviews and Forensic Medical Examinations of children. As testified to by Morgan Rau, the SACAC forensic interviewer who questioned L.A.W., a Forensic Interview is "interviewing a child for court." 3 ER 439.

"Medical exams are needed in most physical abuse incidents wherein legal proceedings are anticipated. It will be necessary to collect physical evidence related to the child's condition or injuries." 3 ER 431. Further, "The collection and documentation of possible forensically significant findings *are vital*." 2 ER 272 (emphasis added).

Between 2007, when he was appointed Medical Director, and December 2020, Woolridge conducted between 450 and 550 FME's on children brought to the SACAC. 2 ER 274. This was in addition to those FME's performed by the two Associate Medical Directors. Id. It is standard procedure, when conducing an FME, for the forensic examiner to expose the child's genitals and anus for examination, whether or not there are allegations of child sexual abuse. 2 ER 290, 3 ER 399.

As publicized by the SACAC, "The use of the Child Advocacy Center approach leads to more timely investigations, faster filing of charges, and a dramatic increase in felony prosecutions of child sexual abuse, with a 196% greater rate of convictions." 2 ER 276.

Upon L.A.W. and the two police officers' arrival at the Center, Ms. Rau takes down information on the child and the parents from Det. Johnston and memorializes these in an SACAC Intake Form. 2 ER 294-295. Rau then conducts the video recorded Forensic Interview of L.A.W.

At 1:00 p.m., Woolridge, in response to a call from Det. Johnston, arrives at SACAC and commences his examination on the child. Woolridge notes on the SACAC medical report form the details of his examination. Under the box "Medical History provided by:…" Dr. Woolridge enters, "No Guardian present." 2 ER 300. He repeats this notation on the Discharge Instructions: "no parent/guardian" present. 2 ER 298. Dr. Woolridge marks "unknown" as to all the medical conditions specified on the form, including those of "Physical Abuse History" and "Sexual Abuse History." 2 ER 300.

At the time Woolridge commences the FME, the child has no complaints of pain, there is no report of an urgent need for medical care, and no report of any sexual abuse. Present in the room for the examination are Maria Garrick, of the SACAC, and Detective Johnston. Johnston's only involvement is to take photographs of the child's body as pointed out by Woolridge.

During the FME, according to the report, Woolridge commences a "standard" genital/anal examination of the child's body, even though there was no allegation of sexual abuse nor any "Ano-Genital Symptoms." 2 ER 301-302. This requires him to remove all the child's clothing, including the pullups, position the child, and then

7

"retract" the buttocks to access the anus. 2 ER 400-401; 3 ER 399-401. With regard to this part of the examination, Woolridge notes "patient resistant to exam." 2 ER 302. Woolridge does not recall at what point the child became resistant. 3 ER 401.

Woolridge marks on a body diagram the location and general appearance of the "lesions" he finds on examination. 2 ER 303. The mark on L.A.W.'s hamstring he notes as "linear contusion 2-3 cm width. Ho to axis of body." He also notes three other "linear contusions" and "two oval/round contusions; demonstrating fading." These two "contusions" are penny-sized and shaped. He does not attempt to draw these to scale. On the Discharge Instructions, Woolridge notes that no medical care is required. 2 ER 298; 3 ER 398.

After Woolridge completes his involvement, L.A.W. remains detained at SACAC in the physical custody of Officer Carrizosa. Det. Johnston leaves to secure a search warrant to search the Wrights' home. 2 ER 333.

## II. DCS Appellees Talamantes and Francisco are Assigned the Hotline Report to Investigate

The Copperview Elementary call to the DCS Hotline was received at 10:13 a.m.[2] The case was transmitted to the local office, and Supervisor Appellee Meghean

---

[2] The facts regarding the DCS Appellees are taken from, unless otherwise noted, those undisputed facts in the Appellees' Statement of Facts [Doc. 307] 2 ER 255-272, filed in support of the Appellees' First Motion for Summary Judgment, and incorporated by them in support of their Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgement, and Cross-Motion for Summary Judgment [the Second

8

Francisco assigned the case to Appellee Gerardo Talamantes. At 3:45 p.m., Talamantes arrived at the SACAC, spoke with Carrizosa, then left for the Wright home, where he arrived as multiple Sahuarita police officers were conducting their searches, interviews and welfare checks on the three other (3) children who were at home. That night, Talamantes presented Brian Wright with a Present Danger Plan requiring the paternal grandmother, Lisa Pugliano, to reside in the home and supervise all of Brian's contact with L.A.W. 24/7 until further notice from the Department. Only L.A.W. was deemed in "present danger," none of the other three children were named.

Talamantes returned to the home on December 18, 2020, and briefly interviewed Brian and Irlanda, but did not ask them about the marks Woolridge had identified on the child. 4 ER 648-651. He questioned L.A.W.'s eight (8) year old sister, who "presented a pleasant and talkative demeanor." 4 ER 647; 4 ER 657-659. Both she and her five (5) year old brother denied being fearful of anyone in the home. 4 ER 647-648. The sister volunteered that she and her siblings "fight, kick and scratch each other." 4 ER 647. Talamantes neither then, nor ever, questioned either child about events on the evening of December 15, 2020.

---

Motion for Summary Judgment], Doc. 365; and their separate Statement of Facts in support of that Motion [Doc. 376], 2 ER 065-068.

On the 21st, Talamantes returned to the Wright home and interviewed both parents about the mark that brought the child to the attention of the police. Talamantes recorded Brian's response, who informed him that the night of the 15th, the two boys, after being put to bed, were heard to be roughhousing in their room, and when Irlanda went to find out what was going on, she saw them play fighting with pieces of Hotwheels track. She gave each child a single spank on the bottom with her open hand and put them to bed. The next morning, Irlanda changed L.A.W. before taking him to school, but did not notice any mark. 4 ER 651.

Talamantes recorded Irlanda's independent report of that night's events. 4 ER 649. Appellees concede that the parents' independent narratives of the events of the night of December 15th were consistent accounts the events. 2 ER 068.

On the 21st, Brian  also showed Talamantes through the home, and showed him three (3) pictures he had taken of the child's bottom and lower legs on the afternoon of December 17th – the day after the child was seized and examined. 2 ER 196. Brian had seen L.A.W.'s bottom and legs the night of the 16th, and the photographs taken the next day accurately showed what he had seen the night before. Brian then texted the images to Talamantes' phone. 2 ER 186-193. Two  images are reproduced here:



As confirmed by these images, the "linear contusions" Woolridge identified in his report – those other than the mark on the left hamstring [visible on the image on the left] – were "very superficial hyperemic lesions" which "tend to clear very fast." 2 ER 185, 303. Appellees below conceded Woolridge's assessment, confirming in briefing to the lower Court that "Dr. Woolridge noted and discounted those marks, further establishing that they were not significant or material…," [Defendants' Response and Cross-Motion for Summary Judgment Doc. 375; pp.11-12].

Hence, Appellees conceded that the *only* "lesion" which might be attributable to the child being hit with an object like a belt or a piece of Hot Wheels track was the mark on the left hamstring which was *not* there on December 15th when Ms. Mendez changed L.A.W. at Copperview Elementary.

Talamantes did not himself visualize the child's body at any time, nor did he secure copies of the photos taken by Det. Johnston during Appellee Woolridge's FME. Nor did Talamantes himself ever interview L.A.W. 2 ER 231.

On December 21st, Talamantes requested the Sahuarita Police Department disclose the report of their investigation. He received the report on December 23rd. 2 ER 233. The report, authored by Officer Carrizosa, detailed the department's investigation the day and evening of December 16th and documented that:

> At approximately 1900 hours, Detective Johnston advised me that after conducting the interviews and welfare checks, the injuries are most likely from roughhousing with his siblings. No probable cause exists to arrest either parent.

> 2 ER 325.

Carrizosa' report documented that the SPD investigation was "Closed 12/16/20." 2 ER 233-234; 2 ER 323.

On the morning of December 28, 2020, Talamantes made notes in the Child Safety & Risk Assessment module of the Department file ["CSRA"] of his review of the Forensic Interview that Rau had conducted of the child on the 16th. 4 ER 645-646. Talamantes' notes confirmed that the child repeated his previous statements to Ms. Mendez that the mark on his leg did not hurt and he did not know how he got it the day before. His narrative of the events of the day before, elicited by Morgan Rau, did not include any reference to being hit by his mother with her hand or any object. He did say he had been spanked five (5) days before by hand;  hit with a belt five (5)

years before; and hit with a Hot Wheels track when he was four (4) years old. Right after making these entries, at 9:00 a.m. on December 28th, Talamantes swore out an application for an *ex parte* Court Authorized Removal Order ["CAR"], 4 ER 696-699. The executed CAR was returned seven (7) minutes later. 2 ER 235.

The Appellees then convened a "Team Decision-making Meeting" [hereafter, "TDM"] attended by Brian Wright and his mother, Mrs. Pugliano. At the conclusion of that meeting, at 11:00 a.m., Talamantes informed Brian of the CAR and that he was going to remove the child and place L.A.W. in foster care. 4 ER 633-634. Talamantes contemporaneously prepared a "Temporary Custody Notice" [hereafter, "TCN"] which he served on Brian at the family home while removing the child. 4 ER 627-629. It is by service of this document that DCS obtains legal custody. 2 ER 236.

Between December 28 and December 31, Talamantes collected documentation in support of a Dependency Petition, and those materials were delivered to the office of the Arizona Attorney General. A draft of the Petition prepared by the AG was reviewed by both Appellees, and Talamantes executed a sworn verification of the truthfulness of its content. 2 ER 237. He swore that "I have read the foregoing Petition and believe upon information and belief that the contents thereof are true and correct." 4 ER 615.

Thereafter, the Petition with attached documents was filed in Superior Court. 2 ER 238; 4 ER 601-626.

Upon the Petition being filed, the Juvenile judge executed *ex parte* "Temporary Orders" that, among other directives, including that the parent was ordered to disclose the child's medical history and records, confirmed the child's legal and physical custody in the Department. 2 ER 262. 4 ER 664-670.

On January 5, 2021, Appellees turned the case over to On-Going Case Management. They had no involvement in the case after that date.

## III. Proceedings Below

This case was commenced on June 28, 2021, asserting claims against multiple defendants. Doc. 1. Following two rounds of motions to dismiss, the remaining defendants included the DCS Appellees under the Seventeenth and Nineteenth Claims; Appellee Woolridge under the Fifth and Sixth Claims, asserting Fourth and Fourteenth Amendment violations in the strip search of the child in conducting the FME; the SACAC; Sahuarita police officers and other DCS agents. Second Amended Complaint, Doc. 85.

In denying Talamantes and Francisco's second Motion to Dismiss the Seventeenth and Nineteenth Claims; the District Court quoted Arizona statutes which require the Department to establish not only that the child probably had sustained physical abuse, but additionally that, in the absence of removal, the child will probably suffer future abuse or neglect. 1 ER 060-061. The Court, denying dismissal, reasoned that:

14

> [T]he question here turns on whether removal and continued custody of LAW were "clearly necessary" to prevent future abuse. A finding of probable cause on this point is undercut by Talamantes and Francisco framing a likelihood of future abuse with the aforementioned alleged misrepresentations and omissions: Mrs. Wright regularly disciplining LAW physically, including with objects such as a belt; Mr. and Mrs. Wright knowing this discipline practice caused LAW bruising; and, nevertheless, Mr. and Mrs. Wright showing little concern that it was harming or injuring LAW. (Doc. 85 ¶¶ 202–04, 209–10.).

1 ER 061.

Subsequently, Plaintiff filed a Third Amended Complaint, joining the City of Sahuarita, Arizona as a party-Defendant. Doc. 204. That Defendant and the individual police officers previously named then settled with Plaintiff and were dismissed. Doc. 248.

On cross-Motions for Summary Judgment, the District Court first denied Appellee Woolridge's argument for qualified immunity, Doc. 361, then reversed itself, denying Appellant's Motion for Partial Summary Judgment, and granting judgment for Appellee on qualified immunity grounds. The Court also granted judgment for the SACAC, Doc 424, 1 ER 002-18. The Court then granted summary judgment for all DCS Defendants sued under the Twenty-second Claim, Doc. 423, 1 ER 019-55, reported at *Wright v. Southern Arizona Children's Advocacy Center*, 2024 U.S. Dist. LEXIS 172104 (D. Ariz. September 24, 2024).  Claims against SACAC and the DCS Defendants named in the Twenty-second Claim are not appealed.

## SUMMARY OF ARGUMENT

This Court reviews a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *Anderson v. Warner,* 451 F.3d 1063, 1067 (9th Cir. 2006), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[W]e must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* Of critical importance to this appeal, particularly as to the judicial deception claims against the DCS Appellees, in reviewing the record as a whole, the Court must disregard all evidence favorable to the Appellees that a jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 139, 151,120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), citing 9 A. C. Wright & A. Miller, *Federal Practice and Procedure* § 2529 at 299 (2d ed. 1995).

## I.   APPELLEE WOOLRIDGE: STRIP SEARCH FORENSIC MEDICAL EXAMINATION

It was alleged below that Dr. Woolridge violated Brian Wright and L.A.W.'s liberty interests [the Fifth Claim], and L.A.W.'s Fourth Amendment right to be free from unreasonable searches [the Sixth Claim].

The undisputed facts establish without reasonable contradiction that Woolridge, in conducting the intrusive FME, was acting under color of law. He willfully participated with Detective Johnston in violating the child and parents'

right to bodily security and familial association. As an initial step, this Court must so hold. The FME, conducted without parental notification and opportunity to object, was clearly established as unconstitutional for twenty (20) years before December 2020. The violations of the First, Fourth and Fourteenth Amendments would not have happened in the absence of Woolridge's integral participation. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *Mann v. County of San Diego*, 907 F.3d 1154 (9th Cir. 2018). Moreover, it is indisputable that Woolridge's administration of the FME was not reasonable – the "genital/anal" examination he conducted with knowledge that no allegations of sexual abuse had been made, and in the absence of any claim by the child of "Ano-Genital Symptoms," was an unforgivable violation of the child's right to bodily integrity.

The second question is whether, in light of this, Appellee is entitled to qualified immunity. It is submitted that clear authority precludes this affirmative defense. The pertinent facts are indistinguishable from those in *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000) in which this Court concluded the physician's actions were taken under color of law, and the physician was not entitled to assert the defense of qualified immunity

The final question as to Woolridge is if he is permitted to assert qualified immunity, did the District Court err in granting summary judgment on this basis? This Court's decision in *Wallis* and *Mann* clearly established that forensic medical examinations conducted as Woolridge did on L.A.W. are unconstitutional. A

17

doctor engaged in a quintessential government activity of investigating child abuse, seizing the child, and conducting medical examinations is held to the same standard as any agent of law enforcement. The facts which deny Dr. Woolridge qualified immunity are indistinguishable from those set out in *Jones v. County of Los Angeles,* 802 F.3d 990 (9th Cir. 2015). This Court should hold that Woolridge was not entitled to qualified immunity. The District Court also erred in granting judgment in favor of Talamantes and Francisco.

## II.    DCS APPELLEES TALAMANTES AND FRANCISCO: JUDICIAL DECEPTION

The single question presented by the Seventeenth and Nineteenth Claims is whether genuine issues of material fact as to judicial deception preclude judgment to Talamantes and Francisco. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir.2002); *Costanich v. Dep't of Soc. & Health Svc's,* 627 F.3d 1101 (9th Cir. 2010); *Benavidez v. County of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021). As the District Court correctly pointed out in denying the Appellee's Motion to Dismiss, the test is not whether there was probable cause that Irlanda Wright had inflicted an injury on L.A.W., but whether it was clearly necessary to remove the child from Brian Wright's custody to protect the child from future abuse by Irlanda. The record evidence includes the misrepresentations the District Court concluded undercut probable cause for removal in its decision denying the Motion to Dismiss. But additional falsehoods were uncovered in discovery, the

key ones being: (1) the child was found on the 16th to have suffered severe or serious harm, and had sustained serious physical injuries which the parent could not, or would not, explain; (2) Brian admitted the marks on L.A.W. were likely caused by Irlanda spanking the child; and (3) law enforcement had an on-going abuse investigation against both parents.

The misrepresentations and material omissions in this record are more numerous and significant than those that this Court concluded were actionable in *Costanich* and *Benavidez*. It remains for a jury to determine what the true facts are, and summary judgment was improperly granted.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST APPELLEE WOOLRIDGE ON THE FIFTH AND SIXTH CLAIMS, AND IN GRANTING APPELLEE SUMMARY JUDGMENT ON QUALIFIED IMMUNITY

#### A. Does a forensic medical examination conducted on a child at the behest of the state and without notice to the parent or a court order authorizing the examination violate both the child and the parent's constitutional rights?

Section 1983 creates a cause of action against any person who, acting under color of state law, violates the federal constitutional rights of another person. 42 U.S.C. § 1983. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) recognized that parent and child have fundamental liberty interests derived from the First and Fourteenth Amendments to the Constitution of the United States. Among those are

"The right to family association [which] includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state."

> *Wallis* announced the rule that

> > [T]he Constitution assures parents that, in the absence of parental consent, *physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials* unless a *judicial officer* has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that *the administration of the procedure is reasonable under all the circumstances.*

> *Id.* (emphasis added, citation omitted).[3]

Wallis was reaffirmed two (2) years before L.A.W. was seized and subjected to Woolridge's "genital/anal" examination. In *Mann v. County of San Diego*, 907 F.3d 1154 (9th Cir. 2018), the court held that when state actors subject children to medical examinations without notification to, or consent of, the parents they violate the Fourth and Fourteenth Amendments. *Id.*, at 1156-57. As in the instant case, there was no allegation that any child had been sexually abused. And, in the instant case of course, Woolridge in positioned L.A.W., and then "retracted" the child's buttocks to access the anus.

---

[3] This Court has recognized two narrow exceptions: the child being in urgent need of medical attention or the reasonable concern for dissipation of material evidence in the time it would take to secure a court order. *Id.,* at 1141. The record facts conclusively refute any suggestion of such an exception here and Woolridge made no such argument below.

*Mann* also made clear that a forensic medical examination without question falls within the ambit of the Fourth Amendment prohibition on unreasonable searches and seizures. *Mann*, *supra*, at 1164, citing *Ferguson v. City of Charleston*, 532 U.S. 67, 76 n.9 (2001); *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990), cert. denied, 498 U.S. 961 (1990); accord *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1206 (10th Cir. 2003) (collecting cases).

Thus, L.A.W. enjoyed a legitimate Fourth Amendment expectation of privacy in not being subjected to the FME without Brian's notice and consent. *Id.* *See, e.g.*, *Yin v. California*, 95 F.3d 864, 871 (9th Cir. 1996) (Persons have "a legitimate expectation of privacy in being free from an unwanted medical examination whether or not that examination entails any particularly intrusive procedures."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1222 (9th Cir. 2020).

A key consideration in the instant case, as in *Mann*, is that as a matter of course in the FME's conducted by Appellee Woolridge and his Associate Medical Directors at SACAC, "[c]hildren are forced to undress and are inspected, by strangers, in their most intimate, private areas." 907 F.3d at 1165.

Is there any question that this FME violated both Brian Wright and L.A.W.'s liberty interests [the Fifth Claim], and L.A.W.'s Fourth Amendment right to be free from unreasonable searches [the Sixth Claim]? The only answer is that there is no question.

It is indisputable, of course, that Appellee was the moving force in those violations.

### B.    Was Appellee acting under color of law?

Neither Appellee nor the Court below seriously contested that Woolridge was acting under color of law. Citing *Jensen v. Lane County*, *supra*, 222 F.3d at 574, the District Court wrote that "In conducting the FME, Dr. Woolridge acted at the behest of a law enforcement officer and pursuant to an established protocol designed solely to accomplish the state's purpose of enforcing its laws." 1 ER 012. Despite this admission, the Court declined to rule on that key issue. "Because it appears that Dr. Woolridge is likely a state actor, the Court turns to the issue of qualified immunity." *Id.*

But given the fundamental importance of doctors, going forward, having no doubt that collaborating with law enforcement to secure evidence in a criminal investigation subjects them to constitutional scrutiny, this Court must rule on this question and unequivocally so.

This Court recognizes four tests by which a private party must answer for his actions under Section 1983. *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747-748 (9th Cir. 2020). As the District Court implicitly acknowledged, the "close nexus/joint action" test first announced in *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) applies and is dispositive.

Joint action "exists where a private party is a willful participant in joint action with the [s]tate or its agents." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir.1989) (citation omitted).

Of pivotal significance in the instant case is the presence of an agreement between the government and the private party. "The Supreme Court has said [the joint action test] is satisfied when the plaintiff is able to establish an agreement … between a government actor and a private party." *Berger v. Hanlon*, 129 F.3d 505, 514 (9th Cir.1997) (*citing Dennis*, 449 U.S. at 27-28) rev'd on other grounds, 526 U.S. 808 (per curiam), opinion reinstated, 188 F.3d 1155 (9th Cir.1999).

The *Jensen* facts and analysis confirm that Woolridge acted under color of law. SACAC and Woolridge, as the Medical Director, have undertaken a complex and deeply intertwined process of detaining and collecting evidence from the bodies of children upon allegations of abuse, bypassing the constitutional protections afforded the child and parent. *Jensen,* 222 F.3d at 575-576.

*Rawson, supra*, 975 F.3d 742, 745-46, substantially augments and expands the reasoning in *Jensen*. *Rawson* noted that whether the four (4) tests are actually distinct, or really only different ways of characterizing the inquiry, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.,* at 747 (citation omitted).

Affirming the lower court, this Court held that the defendants were acting under color of law if characterized as joint action, and, separately, because defendants' actions were "affirmatively commanded by state protocols." *Id.,* at 755 (citation omitted). As in *Rawson,* Appellee Woolridge is charged with "applying state protocols and criteria in making evaluation and … recommendations, and [is] 'affirmatively command[ed]' by the state to [conduct the forensic medical examination] without informed consent [of the person subjected to the examination] in many circumstances." 975 F.3d at 755-56. Here, all facts compel the conclusion that Woolridge's actions were taken under color of law.

### C.     May Appellee assert the affirmative defense of qualified immunity?

Commencing this discussion, the first point to be made is that qualified immunity, as has been extensively discussed in the last decade, is an extra-constitutional defense. It finds no support in the Constitution but is entirely judge-made. *See, e.g*., *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421-2422 (2021) (Thomas, J., concurring in denial of certiorari) (contemporary two-part qualified immunity test "cannot be located in § 1983's text and may have little basis in history."). Courts and commentators have repeatedly and with increasing frequency criticized the defense. As the Fifth Circuit just stated, "We readily acknowledge the legal, social, and practical defects of the judicially contrived qualified-immunity doctrine, but we are powerless to scrap it." *Green v. Thomas*, __ F.3d ___, 2025 U.S. App. LEXIS 4912

*17-18 (5th Cir., March 3, 2025). While this Court, like the Fifth Circuit, is powerless to scrap qualified immunity, it is not powerless to refuse to extend it.

Each time a court "finds" a new fact scenario to which it applies the defense, that court strays further from the source of the right the citizen is seeking to vindicate, and further from constitutional justification. This should give any court pause that is asked to make the conceptual leap taken by the District Court.

To be sure, Appellee claims to have acted as a purely private doctor operating within the standard of care. As to that argument, the Supreme Court responded in *Wyatt v. Cole*, 504 U.S. 158, 168,  112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992),

> Although principles of equality and fairness may suggest, as respondents argue, that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe invalid should have some protection from liability, as do their government counterparts, such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion.

The District Court here, however, substituted an understandable concern for the putatively private actor's sensibilities for the proper consideration of the constitutional principles upon which the citizen brings suit, and the public interest. This skews the analysis, which *Wyatt* refused to do, concluding, "For these reasons, we can offer no relief today." *Id.*

*Richardson v. McKnight*, 521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997), which held that prison guards employed by a private prison-management firm are not entitled to assert qualified immunity, suggested some nexus might be

found that was absent in *Wyatt*. Yet, even in that case, where the defendants were engaged in quintessential state functions, the Court was unable to identify a "firmly rooted" tradition of such immunity supporting the defense. 521 U.S. at 404. Qualified immunity was thus denied. The existence of such a firmly rooted tradition of immunity is the *sine qua non* of the Supreme Court's analysis in such cases. And it is the absence of any "firmly rooted" tradition of immunity afforded doctors performing tasks at the behest of the state that requires denial here, as is discussed *infra*.

*Harlow v. Fitzgerald*, 457 U.S. 800 , 813-15 , 102 S. Ct. 2727 , 73 L. Ed. 2d 396 (1982) of course, first announced the consideration that qualified immunity was necessary to avoid the "unwanted timidity" which would, it was said, result from the potential exposure of state actors to citizen suit for redress of injury because of constitutional wrongs inflicted. See, *Richardson*, *supra*, 521 at 408.

Preventing unwarranted timidity is "the most important special government immunity-producing concern." *Id.*, at 409. When private entities are "systematically organized to perform a major administrative task for profit," and do so "independently, with relatively less ongoing direct state supervision," then "ordinary marketplace pressures" typically suffice to incentivize vigorous performance and prevent unwarranted timidity. *Id*, at 409-410.

What, then, is the evidence in this case that proves that (1) doctors at the common law enjoyed any immunity in working for the government, or (2) that

26

exposure to civil rights violations would make Appellee too timid to continue conducting strip search examinations on children? Did Appellee testify that he would be too timid to continue with his duties as Medical Director if he knew he might be sued for collaborating with law enforcement in violating a parent and child's constitutional rights? There is no such testimony. Dr. Woolridge has been sued, but there is no record evidence that this has caused him to resign his position at SACAC or change his practice in conducting FME's in the least – and this suit was filed three and one half (3 ½) years ago.

In *Halvorsen v. Baird*, 146 F.3d 680 (9th Cir. 1998), this Court applied the *Richardson* factors in denying qualified immunity to a private *not-for-profit* detoxification firm that was under contract to the state to provide involuntary detoxification services. In so doing, this court recognized that the private detoxification firm, like the private prison firm in *Richardson*, "'faces threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job.'" *Id.*, at 686 (quoting *Richardson*, 521 U.S. at 409). This Court also noted that, due to market forces, "if a detox center does a bad job, more effective competitors can bid on the municipal contracts." *Id.*

This set the stage for *Jensen, supra*, and defendant Dr. Robbins' argument for application of qualified immunity. But this Court found no "firmly rooted" tradition of such immunity for physicians contracted by the state to examine or treat citizens involuntarily. *Id.,* 222 F.3d at 577. In so doing, this Court was anticipating the test

27

of entitlement later announced in *Filarsky v. Delia,* 566 U.S. 377, 384, 132 S. Ct. 1657, 182 L. Ed. 662 (2012) by asking whether the person asserting qualified immunity would have been immune from liability under the common law in 1871 when Congress passed the law later codified as Section 1983. The historical record refutes such an argument. *See, e.g., Tanner v. McMurray*, 989 F.3d 860 (10th Cir. 2021) ("the precedents that do exist point in one direction: there was no special immunity for a doctor working for the state.") *citing McCullum v. Tepe*, 693 F.3d 696, 703 (6th Cir. 2012). The requisite history of immunity is, of course, lacking as to a doctor contracting with the state. Applying *Filarsky's* direction, then, Appellee may not claim qualified immunity.

This Court in *Jensen* went on to hold that, with respect to the policy considerations, the facts conformed to *Richardson,* concluding that "As in Richardson, the *potential* for insurance, indemnification agreements, and higher pay all may operate to encourage qualified candidates to engage in this endeavor and to discharge their duties vigorously." 222 F.3d at 578 (emphasis added). SACAC operates under the same market constraints as did the entities in *Jensen* and *Halvorsen*. Neither SACAC, nor Woolridge, proffered any evidence to the contrary. That the corporation is organized without the profit motive is of no consequence, as *Halvorsen, supra,* teaches.

*Jensen* went on to distinguish *Bartell v. Lohiser*, 12 F. Supp. 2d 640 (E.D. Mich. 1998) *aff'd*, 215 F.3d 550 (6th Cir. 2000), a case which had foreshadowed

28

*Filarsky's* analysis. This Court distinguished *Lohiser's* holding, noting that the dispositive facts in that case were "that the defendants were private persons performing a discrete public service task at the express direction and under close supervision of governmental officials." 222 F.3d 579.

This analysis illustrates how the District Court erred in its contrary conclusion and erred in its recitation of the facts as well.

First, the District Court failed to even address the textual analysis of the status of doctors in 1871 commanded by the Supreme Court which, had it done so, would have necessitated denial of qualified immunity.

Second, the District Court erred as well in its analysis of the policy arguments. Attempting to distinguish SACAC from the entities found to be subject to market forces, the Court stated that "SACAC was created through the agreement of municipal entities…." 1 ER 015. That fact is of no consequence. To the contrary, SACAC is a private not-for-profit corporation organized under Arizona law [Doc. 28, SACAC Corporate Disclosure Statement]; 3 ER 480.

Further, that SACAC is the "only identified provider" of forensic medical examinations in Pima County is of no significance to the analysis. It is submitted that Mr. Wright had no burden to present the evidence of the negative. In any event, even the absence of evidence that there *currently* exists a competitor offering the same services in Pima County, it does not therefore follow that the signatories to the

Protocols would not find such willing providers if they sought out a replacement at a competitive level of compensation. The Protocols give SACAC no guarantees.

The evidence favors only Mr. Wright and his son. If SACAC fails to live up to its obligations under the agreement, the partner agencies are free to seek out other providers. The District Court did not address the other market forces announced in *Jensen* – the availability of insurance, indemnity agreements, or the state's ability to increase compensation or other incentives to attract and retain "quality participation" in the joint undertaking. Appellee put into the record no evidence that such market forces are *not* at work. *Jensen* noted that "Dr. Robbins has not presented evidence that these market forces are inapplicable, or inadequate…." *Jensen*, *supra*, 222 F.3d at 578. Nor has Woolridge in the instant case. The District Court gave inordinate weight to Woolridge  being a "part-time employee" of SACAC. The Court concluded that increased compensation would not cause Dr. Woolridge to "continue to perform these examinations" because of exposure to "legal liability." 1 ER 016. This alleged exposure is illusory. The record is devoid of any evidence that Woolridge would abandon his position if he knew he was exposed to suit. As the *Tanner* court wrote, "Healthcare professionals in private practice face a constant threat of claims leading to litigation. Facing constitutional tort claims with a higher burden of proof is not any more daunting or distracting than dealing with the medical malpractice claims with which they are familiar." 989 F.3d at 870.

### D.    Woolridge is permitted to raise the defense, is he entitled to qualified immunity?

Appellee did not contest below that his actions constituted violations of the *Wallis* and *Mann* rule. It bears repeating that the rule announced in *Wallis* is simply that the FME is unconstitutional when done at the behest of the state without notice to the parent. *Wallis*, *supra*, 202 F.3d at 1141. This rule does not impose the obligation to notify the parent on any particular party integral to the examination. What more is needed to prove that the Appellee acted in violation of the First, Fourth and Fourteenth Amendments than that it was his actions that accomplished the constitutional violations? None, we submit.

Dr. Woolridge acted under color of law and his actions violated the child and parents' rights, that much cannot legitimately be disputed. Even the District Court impliedly conceded that point. Thus, the analysis turns to the question of whether the right was clearly established by December, 2020. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

What this Court stated more than two decades ago remains good law. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Calabretta v. Floyd*,

31

189 F.3d 808, 812 (9th Cir. 1999) (internal quotation marks omitted). "[S]pecific binding precedent is not required to show that a right is clearly established for qualified immunity purposes." *Id.* (internal quotation marks omitted).

To be sure, "courts must not define clearly established law at a high level of generality." *Moore v. Garnand*, 83 F. 4th 743, 749 (9th Cir. 2023). In particular, where cases involve scenarios which are evolving, fluid and have potentially deadly consequences – officer-involved shootings, issuance and execution of search warrants, etc. there must be existing precedent that "squarely governs" the specific facts at issue. *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255 (2015) (per curiam). But unlike Mullenix, this is not a police excessive force case involving a hazy legal backdrop.

We assert, as a first proposition, that *Wallis* and *Mann* squarely govern the facts which resolve the question argued by Appellee, and against him, and that there existed in 2020 no "hazy legal backdrop" governing the strip search examinations of children in this Circuit The analysis is quite direct. For insight, the Court's attention is directed to *Demaree v. Pederson*, 887 F.3d 870, 884 (9th Cir. 2018). This Court, reiterating the relevant inquiry – the need for the defendant to identify specific, articulable facts showing imminent danger of abuse justifying exigent seizure of a child [precisely what happened in the instant case] quoted the guidance that "[w]e do not require a case directly on point, but existing precedent must have placed the constitutional question beyond debate." *Id.*, at 882-883, quoting *Ashcroft*

*v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). This Court, citing the test enunciated above, held that the violation was clearly established, and went on to explain that

> Put another way, to say a child can be removed *only* if *x* is likely to happen necessarily means she cannot be removed if there is no indication that *x* is likely to happen. That there is no case law concerning a situation in which *y*, but not *x*, may be likely to happen does not make the rule setting the standards for removal any less clear—the rule is that only a reasonable fear of *x*, not *y*, can provide a constitutional basis for exigent removal.

> *Id.*, at 883 (emphasis in original).

Under the test announced in *Wallis*, the "x" of the *Demaree* equation is satisfied by only four discrete facts in determining whether the violation is clearly established: (1) a child is seized by law enforcement; (2) without court authorization; (3) presented for a forensic medical examination to a doctor engaged to collect criminal evidence from the child's body; and, (4) the parent is given no notice before the examination commences. If those facts were present at SACAC in December 2020, then the Appellee's violations were clearly established. Those facts are incontrovertible. And there is one indisputable fact that rendered the FME inarguably unconstitutional. The administration of the procedure in collecting evidence must be in all ways reasonable, *Wallis* commanded. But conducting the "genital/anal" examination without a *scintilla* of evidence that the child had been sexually abused, the examination entered the realm of unreasonableness, did it not?

But Appellee Woolridge argued below that he cannot be charged with the knowledge of the prohibition set out in *Wallis* and *Mann* because he isn't a police officer or a child protective services investigator. The answer to this claim is that once it is held that Appellee was a state actor engaged in the unconstitutional examination, he must be charged with the same knowledge possessed by any government official so engaged. "It is well-settled that the immunity to which a public official is entitled depends not on the official's title or agency, but on *the nature of the function that the person was performing when taking the actions that provoked the lawsuit.*" *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106 (9th Cir. 2001) (emphasis added). It is submitted that once Woolridge is cloaked with acting under color of law, his status as a private party no longer is part of the equation – he is a public official whose knowledge and actions are judged by the function he performed.

This Court resolved this very question against the private party/state actor physician in *Jones v. County of Los Angeles*, 802 F.3d 990 (9th Cir. 2015).

The Jones' child, G.J., was brought to UCLA Medical Center Emergency Room where x-ray revealed a skull fracture. After UCLA staff referred the case to UCLA's Suspected Child Abuse and Neglect (SCAN) team medical director Dr. Claudia Wang, Wang called in children's services and the county sheriff and falsely informed the mother that the child required hospitalization for further evaluation. *Id.,* at 996-997.

34

In fact, Dr. Wang's only involvement with the child was to search for evidence of child abuse. *Id.,* 1006-1007 (Wang's primary goal was to it was "to investigate the nature and extent of G.J.'s injuries and whether they were caused by abuse."). The child was subsequently detained at the hospital on Wang's order, then children's services intervened, seized the child and commenced a dependency action. *Id.,* at 997-98.

When their son was eventually returned, the parents sued numerous defendants, including Dr. Wang, asserting, as to her, violation of the right to familial association – the same right at issue in the instant case – arising from Dr. Wang's direction that the child be seized without consent or court authorization. On Dr. Wang's motion for summary judgment, the District Court concluded that the case must go to the jury, and on Dr. Wang's interlocutory appeal, this Court agreed with the District Court. *Id.*, at 1000. "[W]hen Dr. Wang took it upon herself to detain G.J. in the hospital, she acted as a government official investigating potential child abuse, not a physician." *Id.*, at 1006, ftnt. 8.

This holding answered the question posed by the first prong of the qualified immunity test. This Court then turned to the second prong. Stating that "Were we faced with a social worker who detained a child without exigent circumstances, this case would fall neatly within our existing case law"[4] the Court addressed two facts:

---

[4] *Id.,* at 1004.

that the actor was a private physician, and the seizure happened in a hospital which, it was argued, so attenuated the connection with the clearly established law  that  Dr. Wang enjoyed qualified immunity. *Id.*, 1005. This Court disagreed. "We conclude that our case law provided fair warning to Dr. Wang that detaining G.J. would violate the Constitution." *Id.*

Thus, stated this Court, echoing *Mabe,* "The appropriate frame for our analysis therefore focuses on what Dr. Wang did, not her title or person." *Id.*, at 1007. After emphasizing that Dr. Wang's primary goal was not to treat the child, but to uncover evidence of abuse, this Court went on to write that "This case presents complex legal and factual issues. However, once the legal landscape is properly understood, the simplicity of the Joneses' claim underscores why the district court did not err when it denied Dr. Wang summary judgment." *Id.* Thus, "The clear guidance our precedent provides to state officials investigating child abuse would put any reasonable state official in Dr. Wang's position on notice that such conduct violated G.J.'s and the Joneses' rights." *Id.*, at 1008.

The proper application of the second prong analysis leads to the same result in the instant case. To paraphrase *Jones*, this Court's clear guidance under *Wallis* and *Mann* would put any reasonable state official in Dr. Woolridge's position on

---

notice that such conduct violated L.A.W.'s and his father's rights. Dr. Woolridge thus cannot prevail on qualified immunity.

In the instant case, however, the consequence of Appellee having no qualified immunity is not that the Fifth and Sixth Claims go to trial. There is no genuine issue of material fact as to Woolridge's liability. Mr. Wright squarely presented the question of Woolridge's liability to the District Court, Docs. 364, 365. The fact that he violated parent and child's rights was undisputed and the District Court erred in denying that motion. There is nothing for a jury to decide. This Court should remand for trial on the question of damages only.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES TALAMANTES AND FRANCISCO ON THE SEVENTEENTH AND NINETEENTH CLAIMS

### A. Standard of review of the Seventeenth and Nineteenth Claims

Brian Wright asserts judicial deception as to both the Seventeenth and Nineteenth Claims. This Court applies the same legal rule to both Claims, *de novo.*

The genesis of the liability of children's services agents for judicial deception is found in this Court's authority addressing the liability of law enforcement for fabrication in support of search and arrest warrants. *See, Costanich v. Dep't of Soc. & Health Svc's, supra*; *Spencer v. Peters,* 857 F.3d 789, 798-802 (9th Cir. 2017); *Benavidez v. County of San Diego*, *supra*. The same standards apply.

We turn, then, to the framework of the correct analysis.

To survive a motion for summary judgment, a plaintiff must establish a genuine issue of fact that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir.2002). A plaintiff's showing of a deliberate falsehood or reckless disregard for the truth must be substantial. *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir.2009). However, the plaintiff's showing on summary judgment does not require "clear proof" of judicial deception. *Id.*

"[A]ll data necessary to show probable cause for the issuance of a [Court Authorized Removal order] must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde,* 440 F.3d 1065, 1067 (9th Cir. 2006) (*en banc*) (citation omitted); *United States v. Hove,* 848 F.2d 137, 140 (9th Cir. 1988) ('An obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge."); *United States v. Thai Tung Luong,* 470 F.3d 898, 905 (9th Cir. 2006) (unsworn, unrecorded oral colloquies inadmissible to show good faith of officer); accord, *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105 (9th Cir. 2002) ("[C]ourts look to the totality of the circumstances known to the officers in determining whether there is probable cause for an arrest").

Hence, summary judgment is improper where "there is a genuine dispute as to the facts and circumstances within an officer's knowledge or what the officer and

claimant did or failed to do." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir.2009) (internal quotation marks and citation omitted); see *Butler v. Elle,* 281 F.3d 1014, 1024 (9th Cir.2002) (per curiam) ("[S]tate of mind is for the jury.").

Probable cause is lacking if [after misrepresentations are redacted, and material facts included in the application] the circumstances set out in the corrected document relied on *are susceptible to a variety of credible interpretations* not necessarily compatible with nefarious activities. *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994) (emphasis added); *quoting United States v. Moore*, 483 F.2d 1361, 1363 (9th Cir.1973); *Henry v. United States*, 361 U.S. 98, 101 (1959).

This Court's analysis must also be guided by its earlier admonition that by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning." *Liston v. County of Riverside,* 120 F.3d 965, 973 (9th Cir. 1997).

It boils down to the following from this Court's decision in *Greene*[5] where it was held that "proof, in the form of [an] affidavit and deposition testimony, that [defendant] included false statements in his affidavit requesting a protective custody order," 588 F.3d at 1035, was sufficient to present a genuine issue of material fact

---

[5] *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2008); vacated in part as moot, 661 F.3d 1201 (9th Cir. 2011).

of judicial deception to which qualified immunity did not apply and summary judgment was inappropriate, *see Id.* at 1035-36. Hence, omission of a fact necessary to establish probable cause presents a triable issue of material fact about whether the omission "amounted to at least reckless disregard for the truth." *Bravo v. City of Santa Maria,* 665 F.3d 1076, 1088 (9th Cir. 2011).

### B.    Supervisor Francisco was an integral participant in securing the two orders

In the District Court's decision denying Appellee Francisco's Motion to Dismiss, the Court quite correctly noted that "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Wright v. S. Arizona Child.'s Advocacy Ctr.,* 2023 U.S. Dist. LEXIS 42808 at **5-6 (D. Ariz. March 14, 2023), citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). Neither the presence of the supervisor when the unconstitutional misconduct happens, nor her specific direction of unconstitutional misconduct, is required. *Starr v. Baca,* 652 F.3d 1202, 1205-06 (9th Cir. 2011).

The record now reveals dispositively that Francisco participated in and directed the decision to file both the Application for the CAR and the Dependency Petition with full knowledge of the facts – and the absence of facts. DCS policy provides that at every "key decision point" from pre-commencement to

investigative closure, the supervisor is to engage the investigator in a "clinical discussion" which "shall proactively prepare the DCS Specialist for key activities and decisions in the life of the case….". 2 ER 069-070. Undisputably, seeking removal of child and commencement of a dependency case are such key decision points.

In the instant case, the Appellees secured temporary custody of L.A.W. through the CAR on the allegation that the child was in "present danger" on the morning of December 28th and the only option was removal. 4 ER 660-663. Both Francisco and Talamantes testified, without contradiction by his supervisor, that Francisco was, "actively involved" in all decisions, and that she collaborated with him the decision to remove the child. 2 ER 070-071.

Hence, the record establishes that if there was judicial deception in the securing of the CAR, and the securing of Temporary Orders, Francisco is jointly liable with Talamantes.[6]

---

[6] In one of several perplexing conclusions, the trial Court dismissed the claims against Francisco, writing that "Plaintiffs fail to point to evidence that supports this contention…." 1 ER 038. However, Plaintiff-Appellant had indeed presented the facts to the Court, [as set out above, in Doc. 366, 2 ER 059-68, the Supplemental Statement of Facts] and argued them. Doc. 364, pp. 4-6.

### C.    Is there a genuine issue of material fact as to judicial deception in Appellees' securing the car order?

This Court's analysis is well-served by consideration of two seminal decisions, *Costanich,* and *Greene v. Camreta, supra.* In *Costanich*, the state revoked the Costanichs' foster care license based on an investigation and declaration submitted by the agency's social worker, Duron. 627 F.3d at 1103-1107. In reversing summary judgment, this Court focused on Duron's sworn report that "she interviewed the children's therapists, that an aide said Costanich called E. a 'fucking cunt, and bitch,' and that a CASA ["Court Appointed Special Advocate"], presumably Isley, said that Costanich used profanity 'toward' the children." *Id.,* at 1113. The individuals quoted, however, refuted Duron's claims, and this Court ruled that such dispute created a genuine issue of material fact requiring the  judicial deception claim to go to a jury. This Court wrote that "Reporting that a witness said something she did not cannot be so characterized [as a non-actionable  recording error or misstatement as a matter of law]." *Id; See*, *Hervey v. Estes*, 65 F.3d 784, 790 (9th Cir.1995) (judicial deception claim must go to the jury when investigator to whom officer securing search warrant attributed statements denied he made them).

In *Greene v. Camreta, supra,* the mother of the children who were seized sued the children's services agents for judicial deception. *Id.*, at 1019-20.  This Court ruled that as of the date of the actions alleged, 2003, judicial deception for

falsification of an affidavit that secured removal of a child was not clearly established, but went on to write that there was indeed a violation:

> According to Sarah [the mother], she told Camreta that there was a place for Nimrod [the father and alleged abuser] to stay so that he would not have any contact with their daughters. Camreta's sworn affidavit states precisely the opposite, claiming that Sarah indicated the family lacked the financial resources to secure alternate housing for Nimrod. These conflicting accounts of the same conversation create a genuine factual dispute as to whether Camreta intentionally or recklessly misrepresented his conversations with Sarah in an effort to persuade the court to remove the children from her custody.

*Id.,* at 1035.

Hence, under this Court's reasoning in *Greene* and *Costanich,* materiality of representations in an application is determined by the *applicant* – if the applicant includes allegations in the submission, he intends that they persuade the issuing court to execute the order sought. Further, where the applicant's representations as to what a parent or third party said are contradicted by the alleged declarant, a genuine issue for trial is presented.

The sworn Application at issue in the instant case is found at 4 ER 660-663. Brian Wright, in the course of discovery, went through the document, and by interlineation and highlighting, identified specific misrepresentations and omissions therein and from that, provided a "corrected" version. 2 ER 195-196; 4 ER 671-673.

Of central importance, Appellees devoted a long paragraph of the Application reporting what Brian had allegedly said to Talamantes – allegations

which supported that removal was clearly necessary. Much of it is false. 4 ER 672. Particularly, this Court should consider the following representation: "Father stated the penny shaped, sized bruises on [L.A.W.'s] buttocks may have been from when stepmother spanked him." Brian Wright, then, is conceding his wife physically abused his son. Defendants went on to claim that Brian confirmed "multiple" lesions on the child, further supporting their request.

However, Brian not only disputes that these statements were made to Talamantes at the time, he also testifies that what he in fact told Talamantes was that the almost imperceptible marks he saw and photographed were consistent with those L.A.W. had previously gotten from roughhousing. 4 ER 672 – a fact omitted by Defendants from the Application.[7]

This dispute of material fact is, alone, sufficient to require the fact-finder determine which side is the more accurate. But the District Court, to the contrary, resolved the credibility dispute in Defendants' favor by simply accepting Talamantes' version. "And Talamantes *recorded* that Brian suggested Irlanda *as the cause of some of the marks after interviewing him on December*

---

[7] In considering, as it must, the totality of the circumstances, this Court must note that Brian's statement is consistent with the conclusion reached by Det. Johnston about the cause of the marks, which evidence Defendants also withheld from the judge.

*21, 2020.* 1 ER 035 (emphasis added). The Court deviated into the fact-finder's domain in resolving all questions of credibility against Appellant.[8]

The factual disputes do not end with the dispute over what Brian allegedly admitted. The District Court previously ruled in denying the Rule 12(b)(6) motion, as discussed *supra,* that evidence contradicting Appellees' allegation that the child reported that Irlanda "regularly" physically disciplined him using belts and Hotwheels track undercuts probable cause for removal. That is precisely the record evidence. Appellees informed the juvenile judge not what the child had actually stated, but that L.A.W. had "disclosed that his stepmother *regularly* uses physical discipline with him and his siblings…." (emphasis added). Mr. Wright has inserted in the "corrected" Application what L.A.W. had actually said in the interview. 4 ER 671. This was confirmed by Talamantes' recording of the interview in the CSRA. 4 ER 645-646. Appellee's

---

[8] In concluding that virtually every misrepresentation or omission was neither false nor that Talamantes deliberately falsified or withheld evidence, the Court quoted testimony Talamantes later gave in the subsequent dependency case [see, e.g., 1 ER 030-032] or simply quoted from his self-serving notations in the investigative file. Classic *ipse dixit.* Further, it is apparent that the trial Court did not assess the facts with an eye to Appellees' recklessness in disregarding the truth but held Mr. Wright to that higher deliberate falsification standard in several instances. At best, Talamantes' subsequent testimony could go no further than create an issue of fact for the jury to weigh in the balance. These repeated credibility determinations alone require reversal.

representations on this point constitute the species of slanted reporting condemned by this Court.

Appellees' allegation, that Brian conceded that his wife physical abused his son, and that he saw the bruising from this abuse the next day goes directly to the second ground for probable cause that was undercut by Brian's evidence. That District Court previously also ruled that "Mr. … Wright knowing this discipline practice caused LAW bruising," if false, undercut probable cause. *See, supra.* We put into the record the evidence that indeed, if believed, reveals the allegation to be false, and that Defendants knew it was false when they wrote it.

As to the third allegation previously addressed by the District Court, that Brian showed "little concern that [Irlanda's physical discipline] was harming or injuring LAW," – in short, that Brian "minimized" the danger to L.A.W. presented by his wife - Talamantes' justification for removal was that "Father and stepmother do not recognize the safety threats, minimize [L.A.W.'s] disclosures and bruises, and have not taken appropriate action to manage the safety threat…" 4 ER 663. In assessing whether Brian's allegedly minimizing the danger was a true statement, we must address the correlative allegation in the Application that "[L.A.W.] is at unreasonable risk of harm at his current home as the parent, guardian, or custodian deliberately harmed [him] *and has caused serious or severe harm.*" (emphasis added). 4 ER 660.

Danger is magnified, is it not, by the parent's knowledge that his spouse has caused severe harm to the child? Under the totality of the circumstances, assessing whether it is clearly necessary to remove a child must include consideration of the severity of the injuries of which the parent is aware, does it not? As discussed, *supra,* there was a wealth of evidence known to Appellees that flat contradicted the inflammatory claim of severe harm. Briefly, first, Appellees never bothered to look at the child, nor interview him, and the images Talamantes did see [two of which are reproduced infra]belied any such claim. Second, Woolridge's report confirmed that the child needed no medical attention, and, further, confirmed the absence of any symptoms or complaints of pain or discomfort. Appellees inclusion in the Application that the child "has multiple oval and linear contusions to his inner thigh, hamstring, and buttock area" 4 ER 662], without including the evidence that these "contusions" were superficial constitutes omission of material fact, does it not?

Indeed, the totality of circumstances requires consideration of the fact that Defendants knew the Copper View nursing assistant, Ms. Mendez, had repeatedly examined the child's body *for the better part of two years* and had seen nothing to suggest abuse. Defendants were aware of these facts, and that L.A.W. denied ever being in pain and had denied that his parents ever caused a bruise or mark on him. Yet, they withheld these facts from the judge.

47

The allegation that Mr. Wright minimized the child's bruises is false on four points: (1) the judge reading the Application had already been misinformed that the child had suffered serious or severe harm; (2) the marks Mr. Wright first saw the evening of the 16th and photographed the next day were, in fact, almost imperceptible, except for the single mark on the left hamstring; (3) Mr. Wright gave an explanation of the origin which was entirely consistent with the mark itself; and (4) Mr. Wright told Talamantes that what he saw on the evening of December 16th was consistent with marks he had seen from roughhousing. Perhaps most important, it is undisputed that the single mark at issue was never seen by Brian *until the evening of the 16th*. How is it possible that a parent minimized an injury and failed to take action to safeguard the child when he was completely unaware of this injury until after the child was in custody?

The District Court was at pains to discount this evidence, concluding as a matter of law that the allegation of sever or serious harm was true. "Talamantes's opinion that the injuries suffered by L.A.W. were serious or severe was supported by Dr. Woolridge's findings." 1 ER 024. But nothing in Woolridge's report made any mention of seriousness or severity of the "lesions." Indeed, the fact that the child needed no medical attention at all belies any claim of severity. Even if the Court was at liberty to draw inferences *adverse* to the non-movant, it was not at liberty to completely ignore the contradictory evidence. This is yet another example of judicial overreach.

Here, the Court engaged in its own minimization. Not only did it hold that Talamantes had *not* misrepresented the severity of the injuries, it added that "To the extent that the characterization of the seriousness of the harm *is inflated*, there is no evidence that Talamantes *deliberately attempted to mislead the court.*" 1 ER 034 (emphasis added). But this doesn't answer the question, does it? The question is whether Appellees were *reckless* in either making the inflammatory allegation or in failing to include the contradictory evidence so that the juvenile judge *could reach his own conclusion as to the existence of probable cause*. Here, as it did in other instances, the District Court displayed an apparent eagerness to absolve Appellees of any but the purest of motives.

It is submitted that the material disputes addressed defeat summary judgment. However, there is another omission, and another falsehood, which this Court must address.

Central to the material omissions, Talamantes did not inform the judge of the parents' explanation of the events of the night of the 15th, when L.A.W.'s five (5) year old brother was found whipping the child with a piece of Hot Wheels track. This is of great significance when this Court considers what Appellees included about the police investigation – and what they left out. Talamantes reported that on the night of the 16th, "Sahuarita Police Department executed a search warrant on the family home and *currently have an ongoing investigation involving the father a stepmother.*" 4 ER 661 (emphasis added).

49

But Appellees conceded that from the report that Talamantes had received on December 23rd [and was the only such report in his possession] the police had not only executed a search warrant on the home, but that Detective Johnston had been present for both the forensic interview and the FME, that a team of officers had conducted welfare checks on the other three (3) children, and that Brian and Irlanda had been questioned, after which, Johnston concluded that the most likely cause of any marks was roughhousing and that the investigation was closed that night. 2 ER 234-235.

As to materiality, Talamantes concedes that the outcome of a police investigation can have an impact on the Department's investigation. 2 ER 077.

Can there be any doubt that Talamantes considered the SPD involvement to be material to the Application? Otherwise, why mention it at all? And why represent that the police had an open investigation not only of Irlanda, but of Brian as well when the official report was closed?

Defendants asserted below, and the District Court accepted, that the investigation was not closed. But that was untrue. Talamantes admitted he has no recall of any communications with SPD during his investigation, and, if he had had such, they would be documented in the CSRA. 2 ER 231. There is no note in the CSRA of Talamantes ever speaking with Detective Johnston or

anyone else at SPD.[9] In holding that the statement is not a misrepresentation, however, the District Court decided that Talamantes' later claim in testimony in the dependency case that he had been told the investigation was not closed was dispositive of its truthfulness. 1 ER 037. In this, the District Court erred in two ways. First, it relied on evidence that Appellees never knew at any time during their involvement, a violation of this Court's teaching that only what was known to the applicant at the time he submitted the sworn statement is relevant. Second, it strayed far into the territory carved out for the fact-finder and engaged in circular reasoning in concluding that the SPD detective's conclusion as to the cause of the marks was not material in part because "the investigation was ongoing." 1 ER 034. But what Defendants knew on *the morning of December 28th* was only found in the report. The District Court was thus wrong on the facts as well.

In conclusion, this Court's reading of the Application in its entirety, not isolating certain passages, but looking for the total story that the applicant must make, should leave this Court with the conviction that summary judgment was improperly granted, and it is for a jury to determine whether judicial deception occurred as asserted in the Seventeenth Claim.

---

[9] On the record, Appellees conceded this fact. 2 ER 068. Hence, Appellees *in this case* have never put evidence in the record that Johnston told him the case was *not* closed.

### D.    Is there a genuine issue of material fact as to judicial deception in Appellees' securing the temporary orders?

Appellees' post-removal submissions to the Attorney General, which were incorporated into the dependency filing, included copies of the TCN [4 ER 616], the CAR Application and Order [4 ER 617-620] and TDM Summary [4 ER 621-626]. Hence, Appellees presented to the juvenile judge all the representations made in securing the CAR. The misrepresentations and omissions in the Application were thus carried forward in the dependency submission. All the infirmities identified in the Application are therefore germane to consideration of the Petition.

As to the body of the Petition itself, the specific allegations are found in Section VI. 4 ER 606. Mr. Wright identified the misrepresentations in that Section of the document. 2 ER 237-238. As this Court can see, these allegations repeated the representations we assert were false or misleading: (1) that the mother regularly uses physical discipline with him and his siblings in the home; (2) that there is an ongoing criminal investigation into both parents; (3) that Brian "reported the penny shaped bruises on [L.A.W.'s] buttocks may have been caused by the mother spanking [L.A.W.]; and (4), that Brian minimized the concerns. Appellees added two additional statements, the first that of the child being "physically disciplined resulting in him receiving bruises and lesions." Appellees added that "Father described the bruises as not being that bad." 4 ER

605. In failing to add that the bruises were, indeed, "not that bad," the allegation is clearly intended to buttress the allegation that Brian minimized the danger of severe harm to the child presented by Irlanda. Again, this is, is it not, the sort of slanted narrative that this Court has condemned when liberty is at stake?

In Section IV, "Aggravating Circumstances," Appellees repeated the allegation that the child had suffered serious physical injury in the care of his father. 4 ER 605-606. The Court below dismissed this, writing that it was the product of the Attorney General, and that Appellant had failed to overcome the presumption of independent judgment. 1 ER 032. This argument was not made by Appellees below, and, hence, never briefed. In any event, the conclusion is erroneous. First, prosecutorial independence is extinguished when the state agents secure the filing through false evidence. *Beck v. Buckland,* 527 F.3d 853, 862 (9th 2008). Second, Talamantes' sworn verification to the truthfulness of the *contents of the Petition* [4 ER 614] makes everything in the document his words, and, by extension, those of Francisco.

Appellees, as to the claim that L.A.W. had suffered serious injuries, doubled down in the Petition materials. In identifying the condition that he claimed justified removal, Talamantes had authored the TCN, which was appended to the Petition. The single condition he identified justifying removal was that "The child *has serious injuries* that the caregiver cannot or will not

explain, or the explanation is inconsistent with the child's injuries or condition." 4 ER 616 (emphasis added).

As addressed, *supra,* the District Court, despite the conflicting evidence, concluded as a matter of law that the claim that L.A.W. had suffered serious injury was true, or, alternatively, even if it was not true Talamantes had *believed it to be true*.

Finally, this Court's attention is directed to a claimed statement made in the TDM Summary. Brian Wright notated certain false statements. The one at issue here is that "the child reported being hit with the metal part of the belt." 1 ER 020; 4 ER 621. This, of course, is an extremely consequential allegation – and is flatly false as the record reveals.

But the District Court disregarded this allegation, indeed, all statements and omissions in the documents appended by Appellees to the Petition in considering the Nineteenth Claim – except when quoting the Appellees' version of events, as addressed, *supra*. The reasoning given was that the TCN and TDM Summary were unsworn documents. 1 ER 026.  So stating, the Court justified this dismissal of evidence with the statement that "The Plaintiffs do not show that the judge relied on the TDM Summary to make the determination of probable cause…" *Id.* The reasoning departs from this Court's guidance on assessing actionability of statements and omissions. This Court's cases direct the District Court to examine the objective facts presented to the juvenile judge

54

by the applicant, not interpretations of the applicant, and those facts omitted, and then excise falsehoods and add in omitted facts to arrive at a determination if the corrected document still establishes probable cause. There is no requirement in this Court's analysis for the citizen to examine the issuing magistrate to learn his or her subjective knowledge and intent.

These Appellees submitted the documents to the juvenile judge as part of the Petition submission itself. Without question, they submitted those materials to persuade the juvenile judge that the child should remain in Department custody with fundamental restrictions on the parent's rights, otherwise, why include them? Clearly the allegations included in the documents are relevant. And, perplexingly, the District Court conceded as much by quoting allegations from the TDM Summary in justifying its holding that Brian had, indeed, minimized the child's injuries. 1 ER 033. ["And, in the TDM, the writer notes that Brian and Irlanda responded to L.A.W.'s disclosures by stating, 'it's just like [L.A.W.] to tell stories like that.' (Doc. 348-5 at 2)"].

Moreover, the false statements in the TCN, the TDM Summary and the Application for the CAR are all relevant to the Appellees' state of mind – did they act recklessly or intentionally in presenting their applications to the juvenile judge? The trial Judge's wholesale disregard of this evidence in summarily dismissing the Nineteenth Claim must not stand.

## CONCLUSION

For the reasons set forth above, Appellant respectfully requests this Court reverse the lower court's judgment and (1) direct entry of judgment against Appellee Woolridge; (2) remand the case for trial on damages against Woolridge; (3) reverse judgment for Appellees Talamantes and Francisco and (3) remand for trial on the Seventeenth and Nineteenth Claims.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, AZ 85718
Telephone: 888-318-0075
mike@mgmoorelaw.com

*Attorneys for Appellant Brian Wright*

## STATEMENT OF RELATED CASES

No related cases are pending in this Court.

Respectfully submitted,

/s/Michael Garth Moore
Michael Garth Moore (023742)
*Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the size 14 type-volume limitation of Fed. R. App. P. 32(a)(7)(B) containing 13,508 words, excluding the parts of the documents exempted by Rule.

Respectfully submitted,

/s/Michael Garth Moore
Michael Garth Moore (023742)
*Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 4, 2025. Participants in the case who are registered CM/ECF users will be served via the appellate CM/ECF system.

Respectfully submitted,

/s/Michael Garth Moore
Michael Garth Moore (023742)
*Attorney for Appellant*