Case No. 24-6668

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————

BRIAN WRIGHT,

*Plaintiff-Appellant,*

v.

GERARDO TALAMANTES, et al.,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Arizona (Case No. 4:21-cv-00257)
The Honorable Jennifer Zipps

———————————

**BRIEF OF AMICUS CURIAE PROFESSOR ALEXANDER A.
REINERT IN SUPPORT OF PLAINTIFF-APPELLANT
IN FAVOR OF REVERSAL**

———————————

Madeleine L. Kim
Nolan Meghrouni-Brown
*Certified Student Attorneys*

Emma Freeman
  *Counsel of Record*
  *Supervising Attorney*
Adam W. Hansen
CIVIL RIGHTS APPELLATE CLINIC
UNIVERSITY OF MINNESOTA
  LAW SCHOOL
229 19th Ave. S.
Minneapolis, MN 55401
emma@apollo-law.com
(646) 363-6766

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................iv

TABLE OF AUTHORITIES ...............................................................vi

INTEREST OF AMICUS CURIAE ......................................................1

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT .....................................................................................5

I.    QUALIFIED IMMUNITY IS FUNDAMENTALLY FLAWED
      AND SHOULD BE ABANDONED .................................................5

      A.    Qualified-Immunity Doctrine Contravenes the Original
            Text of Section 1983, Which Embodies Congress'
            Express Intent ...................................................................7

            (1)   The Notwithstanding Clause establishes that
                  Congress intended to abolish state immunities ............8

            (2)   Legislative history confirms that Congress meant
                  to preclude common-law defenses to Section 1983......10

            (3)   The Reviser's inadvertent changes to Section 1983
                  did not reflect Congress' intent with respect to
                  common-law defenses....................................................13

      B.    The *Pierson* Court Misapplied an Already Dubious
            Canon of Statutory Interpretation .......................................16

            (1)   Legal scholars have criticized the Derogation
                  Canon for over a century...............................................17

            (2)   The *Pierson* Court erred in applying the
                  Derogation Canon to a remedial statute and using
                  it to create a common-law defense ...............................19

II.   WOOLRIDGE IS NOT ENTITLED TO QUALIFIED
      IMMUNITY.................................................................................22

A.    Woolridge Violated Wright's and L.A.W.'s Fourth and Fourteenth Amendment Rights When He Examined L.A.W. Without Parental Notification or Consent ................ 23

    (1)    Woolridge's examination was an unreasonable, warrantless search in violation of the Fourth Amendment ................................................... 24

    (2)    Woolridge violated Wright's and L.A.W.'s Fourteenth Amendment rights to privacy and family association ........................................ 25

B.    Wright's and L.A.W.'s Fourth and Fourteenth Amendment Rights Were Clearly Established ..................... 27

CONCLUSION ......................................................... 31

CERTIFICATE OF SERVICE ...................................................

CERTIFICATE OF COMPLIANCE ...........................................

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Anderson v. Creighton,*
    483 U.S. 635 (1987).................................................................27

*Am. Dist. Tel. Co. v. Kittleson,*
    179 F.2d 946 (8th Cir. 1950) .........................................21

*Ballentine v. Tucker,*
    28 F.4th 54 (9th Cir. 2022) .............................................27

*Baxter v. Bracey,*
    140 S. Ct. 1862 (2020)......................................................6

*Burt v. City of New York,*
    156 F.2d 791 (2d Cir. 1946) ...........................................10

*Camreta v. Greene,*
    563 U.S. 692 (2011)...........................................................5

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022).........................................................22

*Doe v. Lebbos,*
    348 F.3d 820 (9th Cir. 2003) .........................................28

*Elder v. Holloway,*
    510 U.S. 510 (1994).........................................................27

*Evans v. Skolnik,*
    997 F.3d 1060 (9th Cir. 2021) .........................................4

*Ferguson v. City of Charleston,*
    532 U.S. 67 (2001).........................................................24

*Greene v. Camreta,*
    588 F.3d 1011 (9th Cir. 2009) .......................................28

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939)........................................................................14

*Ioane v. Hodges*,
    939 F.3d 945 (9th Cir. 2018) ....................................................24, 27

*Isbrandtsen Co., Inc. v. Johnson*,
    343 U.S. 779 (1952)................................................................19–20

*Jones v. Cnty. of Los Angeles*,
    802 F.3d 990 (9th Cir. 2015) ......................................................4, 30

*Jones v. Cnty. of Los Angeles*,
    722 F. App'x 634 (9th Cir. 2018) ....................................................29

*Katz v. U.S.*,
    389 U.S. 347 (1967)........................................................................24

*King v. Burwell*,
    576 U.S. 473 (2015)................................................................12, 16

*Kisela v. Hughes*,
    584 U.S. 100 (2018)) ........................................................................6

*Mann v. Cnty. of San Diego*,
    907 F.3d 1154 (9th Cir. 2018) ..................................4, 22–26, 28–29

*Monroe v. Pape*,
    365 U.S. 167 (1961)........................................................7, 12, 14, 18

*Parham v. J.R.*,
    442 U.S. 584 (1979)........................................................................26

*Picking v. Pa. R.R. Co.*,
    151 F.2d 240 (3d Cir. 1945) ............................................................10

*Pierson v. Ray*,
    386 U.S. 547 (1967)............................................2–10, 12–14, 16–22

*Rogers v. Jarrett,*
    63 F.4th 971 (5th Cir. 2023) ..........................................................18

*Sandoval v. Cnty. of San Diego,*
    985 F.3d 657 (9th Cir. 2021) ........................................................31

*Scharfeld v. Richardson,*
    133 F.2d 340 (D.C. Cir. 1942) ......................................................21

*Stanton v. Sims,*
    571 U.S. 3 (2013) ..........................................................................27

*Tanzin v. Tanvir,*
    592 U.S. 43 (2020) ........................................................................21

*Troxel v. Granville,*
    530 U.S. 57 (2000) ........................................................................23

*Turner v. Glickman,*
    207 F.3d 419 (7th Cir. 2000) ..................................................14–15

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,*
    350 U.S. 332 (1956) ......................................................................21

*U.S. v. Goldenberg,*
    168 U.S. 95 (1897) ..................................................................15–16

*U.S. Nat'l Bank of Or. v. Ind. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993) ..........................................................13, 15–16

*Wallis v. Spencer,*
    202 F.3d 1126 (9th Cir. 2000) ...................................4, 22–23, 25–30

*Wyatt v. Cole,*
    504 U.S. 158 (2000) ........................................................................9

*Yin v. California,*
    95 F.3d 864 (9th Cir. 1996) ..........................................................24

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)............................................................6, 18, 28

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 7, cl. 2......................................................14

U.S. Const. amend. IV ...........................................................23

## STATUTES

28 U.S.C. § 1983 ......................................2, 6–10, 12–17, 19–21

An Act to Enforce the Provisions of the Fourteenth Amendment to the
United States Constitution, and for Other Purposes, 17 Stat. 13 (1871)
.........................................................................................................8

Revised Statutes of 1873, 1 Rev. Stat. 1091 (1873)................................15

## OTHER AUTHORITIES

Alexander A. Reinert, *Asymmetric Review of Qualified Immunity*, 20 J.
EMPIRICAL L. STUD. 4 (2023) ......................................................1

Alexander A. Reinert, *Does Qualified Immunity Matter?*, 8 U. ST.
THOMAS L. J. 477 (2011)..........................................................2–5

Alexander A. Reinert, *Measuring the Success of Bivens Litigation and
Its Consequences for the Individual Liability Model*, 62 STAN. L. REV.
809 (2010) ................................................................................2

Alexander A. Reinert, *Qualified Immunity at Trial*, 93 NOTRE DAME L.
REV. 2063 (2018) ......................................................................1

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111
CAL. L. REV. 201 (2023).............................................2, 6–9, 11–15, 19–21

Alexander A. Reinert, *The Influence of Government Defenders on
Affirmative Civil Rights Enforcement*, 86 FORDHAM L. REV. 2181 (2018)

.........................................................................................................1

Alexander A. Reinert, Joanna C. Schwartz, and James E. Pfander, *New Federalism and Civil Rights Enforcement: A Progressive Platform for State and Local Governments*, 116 NORTHWESTERN L. REV. 737 (2021) ..8

CODIFICATION, BLACK'S LAW DICTIONARY (12th ed. 2024) ........................7

CONG. GLOBE, 42d Cong., 1st Sess. (1871) ...................................11–12, 19

ENACT, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................7

Erwin Chemerinsky, *Closing the Courthouse Doors*, 41 HUM. RTS. 5 (2014) ...........................................................................................................5

Jack M. Beermann, *A Critical Approach to Section 1983 with Special Attention to Sources of Law*, 42 STAN. L. REV. 51 (1989)...........................5

James E. Pfander, Alexander A. Reinert, and Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When Bivens Claims Succeed*, 72 STAN. L. REV. 561 (2020) ...........................................................................1

J.G. Sutherland, 2 STATUTES AND STATUTORY CONSTRUCTION § 400 (1st ed. 1891) ..................................................................................................19

Joanna C. Schwartz, *After Qualified Immunity*, 120 COLUM. L. REV. 309 (2020) .....................................................................................................5–6

Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. REV. 885 (2014) ...........................................................................................................5

Joanna C. Schwartz, *Qualified Immunity's Selection Effects*, 114 NW. U. L. REV. 1101 (2020) ................................................................................5

Michael Sinclair, *"Only A Sith Thinks Like That": Llewellyn's "Dueling Canons," One to Seven*, 50 N.Y. L. SCH. L. REV. 919, 943 (2006) ............19

Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 ARK. L. REV. 741 (1987) .......
..................................................................................................5, 10–12, 19

Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ..................................................................................18

Theodore Sedgwick, A Treatise on the Rules Which Govern the Interpretation and Construction of Statutory and Constitutional Law (2d ed. 1874) ......................................................................17

Will Tress, *Lost Laws: What We Can't Find in the United States Code*, 40 Golden Gate U. L. Rev. 129 (2010) ...............................................13–15

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018) ..............................................................................................5

## INTEREST OF AMICUS CURIAE[1]

Professor Alexander A. Reinert is the Max Freund Professor of Litigation and Advocacy at the Benjamin N. Cardozo School of Law.[2] He is a legal scholar with expertise in civil procedure, constitutional law, and federal courts, among other disciplines. He researches and teaches in all of these areas and has a particular scholarly focus on the doctrine of qualified immunity, having authored or coauthored numerous articles regarding civil rights litigation and qualified immunity. *See, e.g.*, Alexander A. Reinert, *Asymmetric Review of Qualified Immunity*, 20 J. EMPIRICAL L. STUD. 4 (2023); Alexander A. Reinert, Joanna C. Schwartz, and James E. Pfander, *New Federalism and Civil Rights Enforcement: A Progressive Platform for State and Local Governments*, 116 Nw. L. REV. 737 (2021); James E. Pfander, Alexander A. Reinert, and Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When Bivens Claims Succeed*, 72 STAN. L. REV. 561 (2020); Alexander A. Reinert, *Qualified Immunity at Trial*, 93 NOTRE DAME L. REV. 2065 (2018); Alexander A. Reinert, *The Influence of Government Defenders on Affirmative Civil Rights Enforcement*, 86 FORDHAM L. REV. 2181 (2018); Alexander A.

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a). Undersigned counsel for amicus curiae certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amicus and his counsel have contributed money for this brief.

[2] Institutional affiliation is provided for purposes of identification only.

1

Reinert, *Does Qualified Immunity Matter?*, 8 U. St. Thomas L. J. 477 (2011); Alexander A. Reinert, *Measuring the Success of Bivens Litigation and Its Consequences for the Individual Liability Model*, 62 Stan. L. Rev. 809 (2010).

Most germane to amicus' interest in this proceeding, Professor Reinert's recent scholarship explores the critical flaws in the Supreme Court's judge-made doctrine. Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023). Amicus has a demonstrated interest in a proper understanding of the doctrine of qualified immunity and the significant flaws in its origins.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's grant of qualified immunity to Defendant-Appellee Dr. Dale Woodridge for two reasons.

First, the doctrine of qualified immunity has never been legitimate and should be abandoned as a defense to Section 1983 actions. When the Supreme Court first invented qualified immunity in *Pierson v. Ray*, 386 U.S. 547 (1967), the Court made two related errors. The first error was textual: the *Pierson* Court ignored a portion of original text of Section 1983, which contained clear language expressing Congress' intent to *exclude* common-law immunity defenses from the statute. Failing to account for that critical language led the *Pierson* Court to assume, wrongly, that Congress had no view as to whether such common-law defenses could defeat Section 1983 liability. That incorrect assumption—

2

the Court's first misstep—became the basis for *Pierson*'s creation of qualified immunity. Legislative history confirms that Congress meant to exclude immunity defenses from Section 1983. The inadvertent omission of the original text from the codified version of the statute does not remotely change that conclusion, much less authorize courts to contradict the clear intent of Congress.

Qualified immunity is fundamentally flawed for a second, independent reason. Compounding its initial failure to consider the intended text of Section 1983, the *Pierson* Court went further astray by misapplying the widely-criticized Derogation Canon of statutory interpretation, which assumes legislation does not displace common-law rights absent clear language. As legal scholars and jurists alike have noted for over a century, the Canon exemplifies a sorely-outdated vision of the relationship between courts and Congress. What's more, *Pierson* invoked the Derogation Canon to create qualified immunity even though the Canon was never meant to apply to common-law defenses.

Even assuming qualified immunity survives, Woolridge is not entitled to it, and the district court erred in reaching the opposite conclusion. Woolridge violated the Fourth and Fourteenth Amendment rights of Plaintiff-Appellant Brian Wright and his minor son, L.A.W., when he conducted an unauthorized forensic medical examination on L.A.W. without notifying his parents or obtaining their consent. Although the district court did not reach that merits question, this Court

should squarely address it, because "if courts routinely decline to reach the first prong of the qualified immunity inquiry, the development of constitutional precedent will be hamstrung." *Evans v. Skolnik*, 997 F.3d 1060, 1076 (9th Cir. 2021) (Berzon, J., concurring in part). This Court should then reverse the district court's erroneous conclusion that Wright's and L.A.W.'s rights were not clearly established. This Court made clear more than two decades ago that *any* official in Woolridge's shoes violates the Fourth and Fourteenth Amendments if he examines a minor child without parental notification. *See Wallis v. Spencer*, 202 F.3d 1126, 1146–42 (9th Cir. 2000); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018). And Woolridge should have known that these constraints apply to police officers, social workers, and doctors alike. *See Jones v. Cnty. of Los Angeles*, 802 F.3d 990 (9th Cir. 2015), *superseded on other grounds in* 722 Fed. App'x 634 (9th Cir. 2018).

While only the Supreme Court can overrule its qualified immunity jurisprudence, this Court should lend its voice to the growing chorus of jurists and scholars who recognize that this doctrine is fundamentally at odds with the Reconstruction Congress' goals for Section 1983. Your amicus asks this Court to reject any further expansion of the judicially-created qualified-immunity doctrine, hold that Woolridge violated Wright's and L.A.W.'s clearly-established rights, and urge the Supreme Court to disavow *Pierson* and its progeny. This path will avoid "leav[ing]

4

standards of official conduct permanently in limbo." *Camreta v. Greene*, 563 U.S. 692, 706 (2011) (cleaned up).

## ARGUMENT

### I.  QUALIFIED IMMUNITY IS FUNDAMENTALLY FLAWED AND SHOULD BE ABANDONED.

The qualified-immunity defense devised by the Supreme Court in *Pierson v. Ray*, 386 U.S. 547 (1967), has never stood on firm legal ground. Scholars, advocates, and jurists across the ideological spectrum— including several Supreme Court Justices—have rightfully criticized qualified immunity, urging its reconsideration for decades.[3] There is no

---

[3] For example, scholars have argued that qualified immunity defies the text, purpose, and historical origins of Section 1983. *See, e.g.*, Jack M. Beermann, *A Critical Approach to Section 1983 with Special Attention to Sources of Law*, 42 STAN. L. REV. 51, 54–70 (1989); Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 ARK. L. REV. 741, 744, 774, 794 (1987). Others maintain that the defense is "unlawful and inconsistent with conventional principles of statutory interpretation." William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45, 45 (2018). Still others assert that it violates the foundational American principles that no one is above the law and that violations of constitutional rights must be remedied. *See, e.g.*, Erwin Chemerinsky, *Closing the Courthouse Doors*, 41 HUM. RTS. 5 (2014). And yet others express concern that it prevents plaintiffs from obtaining relief in civil rights litigation. *See, e.g.*, Alexander A. Reinert, *Does Qualified Immunity Matter?*, 8 U. ST. THOMAS L.J. 477, 494–95 (2011); Joanna C. Schwartz, *Qualified Immunity's Selection Effects*, 114 NW. U. L. REV. 1101, 1131–38 (2020); Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. REV. 885, 891 (2014). For these reasons and more, "[c]ourts, scholars, and advocacy organizations across the political spectrum are calling on the Supreme Court to limit qualified immunity or do away with the defense altogether." Joanna C.

shortage of reasons to dismantle qualified-immunity jurisprudence. Qualified immunity "stray[s] from the statutory text." *Baxter v. Bracey*, 140 S. Ct. 1862, 1862 (2020) (Thomas, J., dissenting from denial of certiorari). It contravenes the historical background of Section 1983. *Id.* It exemplifies "the sort of freewheeling policy choice[s]" courts are powerless to make. *Ziglar v. Abbasi*, 582 U.S. 120, 159–60 (2017) (Thomas, J., concurring in part and concurring in the judgment) (cleaned up). In short, qualified immunity and its foundational logic in *Pierson* are simply "wrong on the law." *See Kisela,* 584 U.S. 100, 121 (2018) (Sotomayor, J., dissenting); *Ziglar*, 582 U.S. at 160 (Thomas, J., concurring).

Here's why.

First, *Pierson* created qualified immunity from whole cloth in reliance on one foundational premise: that there was "no clear indication that Congress meant to abolish" common-law defenses (like immunity) to Section 1983. 386 U.S at 554. But *Pierson* failed to consider the plain language of Section 1983 as it was actually enacted by the 1871 Congress. That language—inadvertently omitted from the codified version of the statute—expressly precluded the availability of state common-law defenses in Section 1983 actions. *See* Alexander A. Reinert, *Qualified*

---

Schwartz, *After Qualified Immunity*, 120 COLUM. L. REV. 309, 309 (2020); *see id.* at 311–12 n.6–8 for additional examples of criticisms of qualified immunity and a collection of various calls for its abolition.

6

*Immunity's Flawed Foundation*, 111 CAL. L. REV. 201, 235–38 (2023) [hereinafter "Reinert"]. For that reason alone, qualified immunity defies Congress' clear intent and should not remain a viable defense.

Second, qualified immunity would still be unsupportable even had the *Pierson* Court accounted for the intended text of Section 1983. That's so because the *Pierson* Court made another critical mistake: misapplying the outmoded and inapposite Derogation Canon to elevate common-law doctrine over the clear say-so of Congress. Reinert, 111 CAL. L. REV. at 235–38.

Taken together, these errors demand that *Pierson* be overruled. This Court should urge the Supreme Court to take that necessary step.

### A. Qualified-Immunity Doctrine Contravenes the Original Text of Section 1983, Which Embodies Congress' Express Intent.

The version of Section 1983 interpreted by the *Pierson* Court is not the version that the 1871 Congress actually enacted in the Civil Rights Act. The enacted version of the statute contained a crucial additional clause that was unintentionally "left out" when Section 1983 was codified in the Revised Statues.[4] *Monroe v. Pape*, 365 U.S. 167, 228 (1961) (Frankfurter, J., dissenting); Reinert, 111 CAL. L. REV. at 235–38. That

---

[4] *See also* ENACT, BLACK'S LAW DICTIONARY (12th ed. 2024) (a law is "enacted" when it is passed and made authoritative); CODIFICATION, BLACK'S LAW DICTIONARY (12th ed. 2024) ("codification" refers to the process of "compiling, arranging, and systematizing" enacted laws into an "ordered code").

omitted clause—which the *Pierson* Court wholly ignored—declared that state actors who violate federal law would be liable under Section 1983, "*any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*" [hereinafter the "Notwithstanding Clause"]. *Compare* An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, ch. 22, § 1, 17 Stat. 13 (1871) [hereinafter the "Civil Rights Act of 1871"] *with* 42 U.S.C. § 1983.

Section 1983's Notwithstanding Clause shatters *Pierson*'s purported justification for creating qualified immunity. The Clause—an unambiguous command from a supermajority of the Reconstruction Congress—forecloses on its face the application of common-law defenses to Section 1983 liability. *See* Reinert, 111 CAL. L. REV. at 235. Legislative history confirms that Congress wanted to maximize Section 1983's rights-protecting qualities—not give state actors an escape hatch from money damages. *Id.* And the omission of the Clause from the codified version of the statute does nothing to alter the force and meaning of its plain text.

**(1)    The Notwithstanding Clause establishes that Congress intended to abolish state immunities.**

On its face, the text of the Notwithstanding Clause exposes the groundlessness of qualified immunity.

8

*Pierson* held that police officers sued under Section 1983 could raise common-law defenses that would have been "available to the officers in the [analogous] common-law action." 386 U.S. at 557. Unable to find evidence of congressional intent to "abolish wholesale all common-law immunities," *id.* at 554, *Pierson* merely assumed the opposite conclusion: that Congress intended to retain common-law principles, including defenses rooted in state common law. *Id.* at 554–55. *Pierson* reasoned that, "had [Congress] wished to abolish" common-law defenses, it "would have specifically so provided." *Id.* The Court therefore extended "the defense of good faith and probable cause" to the officers because that defense would have been "available to the officers in [a] common-law action" at the time of Section 1983's enactment. *Id.* at 556–57. This common-law defense quickly morphed into the doctrine now known as qualified immunity. *See, e.g.*, *Wyatt v. Cole*, 504 U.S. 158, 163–66 (1992).

But *Pierson* runs headlong into the Notwithstanding Clause. At the time Section 1983 was enacted, the Clause's plain language—particularly, the term "custom or usage"—was understood to encompass state common-law principles. *See* Reinert, 111 CAL. L. REV. at 235–36. That means the Notwithstanding Clause explicitly and unambiguously made the state common-law defenses *Pierson* relied on to create qualified immunity categorically unavailable to Section 1983 defendants. *Id.* at 236. *Pierson* failed to account for the clear textual command of Section 1983's enacted language.

9

*Pierson*'s error is particularly clear in light of earlier judicial interpretations of Section 1983, which uniformly recognized that state-law immunities could never shield state officials from Section 1983 liability. Before *Pierson*, federal courts of appeals correctly understood that the 1871 Civil Rights Act did not incorporate affirmative defenses, let alone categorical immunities. *See, e.g.*, *Burt v. City of New York*, 156 F.2d 791, 793 (2d Cir. 1946) (Hand, J.) ("[A]ny public officer of a state, or of the United States, will have to defend any action bought in a district court…in which the plaintiff…is willing to make the necessary allegations."). Other courts similarly reached the "irresistible [conclusion] that Congress by enacting the Civil Rights Act *sub judice* intended to abrogate" all such defenses. *Picking v. Pa. R.R. Co.*, 151 F.2d 240, 250 (3d Cir. 1945), *overruled in part by Bauers v. Heisel*, 361 F.2d 581 (3d Cir. 1966). Early Section 1983 jurisprudence thus further supports the conclusion that qualified immunity lacks any textual, or historical foundation.

> **(2)   Legislative history confirms that Congress meant to preclude common-law defenses to Section 1983.**

If the enacted text weren't enough, the legislative purpose and history of the 1871 Civil Rights Act also "cuts against" importing immunities into Section 1983. Matasar, 40 ARK. L. REV. at 774.

Through the Civil Rights Act, Congress enforced the Fourteenth Amendment's core mandate: universal equality among citizens of the

10

United States. Allowing state-law defenses to defeat Section 1983 liability would have been antithetical to Congress' express goal of remedying "lawless acts…done in pursuance of any law or act of the States." *See* CONG. GLOBE, 42d Cong., 1st Sess. 820, 375 (1871) (statement of Rep. Lowe). At the time the Civil Rights Act was passed, state courts "[we]re in many instances under the control of those who [we]re wholly inimical to the impartial administration of law and equity." *Id.* at 394 (1871) (statement of Rep. Rainey). Given this mistrust, the 1871 Congress could not possibly have intended to empower state courts—the ultimate arbiters of state common law—to limit Section 1983 liability through common-law immunities. After all, "[w]hat benefit would result from appeal[ing] to tribunals whose officers [we]re secretly in sympathy with the very evil against which [Congress was] striving?" *Id.*; *see also* Reinert, 111 CAL. L. REV. at 238–41.

Contemporaneous speeches by members of the 1871 Congress confirm that the Notwithstanding Clause was intended to abrogate common-law defenses. For example, one senator expressed concern that "the language of [Section 1983]," as enacted, might deprive even state legislators and judges of well-established *absolute* immunities. CONG. GLOBE, 42d Cong., 1st Sess., App. 217 (1871) (remarks of Sen. Thurman). But no legislator rose to contradict that assertion or otherwise "respond[] to his invitation" to assuage those concerns. *See* Matasar, 40 ARK. L. REV. at 774. Nor did any lawmakers address similar concerns about the scope

11

of Section 1983 raised by other congressmen. *See, e.g.*, CONG. GLOBE, 42d Cong., 1st Sess., App. 365–66 (1871) (remarks of Rep. Arthur) (asking whether state actors, "though as pure in duty as a saint," can be held liable "for a mere error of judgment") *and* Matasar, 40 ARK. L. REV. at 771–75.

Thus, the *Pierson* Court missed the mark in two ways when it claimed that the legislative record was "silent" as to Congress' intent to override common-law defenses. The Notwithstanding Clause spoke directly to that question, and legislative history makes clear that the legislators who passed the 1871 Civil Rights Act understood that the Act would impose liability without regard to common-law defenses. *See* Matasar, 40 ARK. L. REV. at 771. *Pierson*'s claim that Congress gave "no clear indication" of an intent "to abolish" common-law defenses like qualified immunity is inconsistent with Section 1983's legislative history as well as its enacted text. 386 U.S at 554. *See, e.g.*, Matasar, 40 ARK. L. REV. at 765–778; Reinert, 111 CAL. L. REV. at 235–41; *Monroe*, 365 U.S. at 228 (Frankfurter, J., dissenting) (stating that Section 1983's intended text, including the Notwithstanding Clause, "clarified the objective to which the provision was addressed").

The legislative history—like the text—is incontrovertible: the qualified-immunity doctrine *Pierson* invented far exceeded the Court's limited power "to pronounce the law as Congress has enacted it." *King v. Burwell*, 576 U.S. 473, 515 (2015) (Scalia, J., dissenting).

**(3)    The Reviser's inadvertent changes to Section 1983 did not reflect Congress' intent with respect to common-law defenses.**

Courts interpreting Section 1983 should rely exclusively on the original, enacted text of the statute. That's because omitting the Notwithstanding Clause from the codified version of Section 1983 was "not the product of any positive lawmaking" by Congress. Reinert, 111 CAL. L. REV. at 236. Rather, it was the result of an error made by a non-legislative entity—the First Reviser of Federal Statutes—when publishing the very first edition of the Revised Statutes of the United States. *Id*. at 236–37. That project was a "massive revision, reorganization, and reenactment of all statutes in effect at the time." *U.S. Nat'l Bank of Or. v. Ind. Ins. Agents of Am., Inc.*, 508 U.S. 439, 449 (1993). And despite congressional efforts to retroactively correct the First Reviser's numerous transcription errors, the omission of the Notwithstanding Clause from Section 1983 was never caught. *See* Reinert, 111 CAL. L. REV. at 237; Will Tress, *Lost Laws: What We Can't Find in the United States Code*, 40 GOLDEN GATE U. L. REV. 129, 135–36 (2010). As a result, an incomplete version of what is now Section 1983 was eventually codified at 42 U.S.C. § 1983. That codified version—not the statute's enacted, intended text—is what the *Pierson* Court eventually interpreted. Reinert, 111 CAL. L. REV. at 235–37.

But the absence of the Notwithstanding Clause from the codified version of Section 1983 does not mean courts can ignore that original

13

statutory language. That's so for two reasons. First, and crucially, the First Reviser had *zero* authority to make any substantive changes to the law. Reinert, 111 CAL. L. REV. at 236–37. The Supreme Court itself has recognized that the Reviser's changes were "not intended to alter the scope" of any federal statute. *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939). Regarding Section 1983 specifically, "[n]o alteration in statutory coverage is permissibly to be based upon the change" made by the First Reviser, even prior to *Pierson. Monroe*, 365 U.S. at 228 (Frankfurter, J., dissenting).

The Reviser's powerlessness to alter the substance of statutory provisions directly impacts how courts ought to interpret Section 1983. The steps to make federal law are elementary: Congress passes a bill and the President signs it. U.S. Const. art. I, § 7, cl. 2. The Reviser has no power to alter federal law. Because the Reviser's inadvertent omission cannot change the plain meaning of the intended statutory text, courts must read the revised Section 1983 to have *the same substantive meaning* as the originally-enacted version. *Hague*, 307 U.S. at 510. This principle applies straightforwardly here: courts must give effect to the Notwithstanding Clause. Otherwise, the Reviser's omission of congressionally-enacted language from the statute's actual text would substantively change the statute's meaning. *See* Tress, 40 GOLDEN GATE U. L. REV. at 135–36; Reinert, 111 CAL. L. REV. at 237–38; *see also Turner*

14

*v. Glickman*, 207 F.3d 419, 428 (7th Cir. 2000) (according no weight to reviser's placement of provision of Statutes at Large in criminal code).

Courts must account for the Notwithstanding Clause for a second, equally significant reason: whether or not the Clause can be considered the actual text of Section 1983, it is powerful—indeed, dispositive—evidence of congressional intent. To be sure, the publication of the first edition of the Revised Statutes was unusual. Unlike every subsequent edition of the Revised Statutes, Congress both codified the first edition and declared that the newly codified versions of the statutes it contained were to replace "the previously passed session laws…as legal authority." Tress, 40 GOLDEN GATE U. L. REV. at 135 (citing Revised Statutes of 1873, Sec. 559, 1 Rev. Stat. 1091 (1873)); *see U.S. Nat'l Bank of Or.*, 508 U.S. at 450 n.4. When codifying the first Revised Statutes, Congress inadvertently repealed the intended text of Section 1983 and replaced it with the misprinted, incomplete version we know today. Tress, 40 GOLDEN GATE U. L. REV. at 135; Reinert, 111 CAL. L. REV. at 236–38.

But by all accounts, this repeal was entirely accidental, Reinert, 111 CAL. L. REV. at 236–38—a technicality that cannot overcome Congress' choice to include the Notwithstanding Clause when it first drafted Section 1983. Of course, "[t]he intent of the lawmaker is to be found in the language that he has used." *U.S. v. Goldenberg*, 168 U.S. 95, 102–03 (1897). Since there are "cogent reasons for believing that the letter [of the codified version of Section 1983] does not fully and

15

accurately disclose the [legislature's] intent," *id.*, ignoring the Notwithstanding Clause would contravene that bedrock principle of statutory interpretation. That's so regardless of whether the Notwithstanding Clause is deemed the "text" proper of Section 1983.

Courts must fulfill their primary obligation to effect "the will the legislator." *Goldenberg*, 168 U.S. at 103. Here, the meaning of that obligation is clear: the Notwithstanding Clause should control the availability of affirmative defenses to Section 1983 actions. The First Reviser's omission of the Clause from Section 1983 is precisely the sort of typographical mishap, "patently obvious to a[ny] reasonable reader," that cries out for judicial correction. *King*, 576 U.S. at 514 (Scalia, J., dissenting); *see U.S. Nat'l Bank of Or.*, 508 U.S. at 445–48, 462.

## B. The *Pierson* Court Misapplied an Already Dubious Canon of Statutory Interpretation.

Ignoring the Notwithstanding Clause was not the *Pierson* Court's only mistake. The Court further erred by applying the Derogation Canon of statutory interpretation when it determined that officials sued under Section 1983 for constitutional torts could claim immunity. The Court's reliance on the Canon, which declares that "statutes in derogation of the common law are to be strictly construed," *Pierson*, 386 U.S. at 561 (Douglas, J., dissenting), was doubly misguided. First, scholars and jurists have sharply criticized the Derogation Canon for decades in light of its outdated assumptions about the relationship between Congress and

16

federal courts. Second, even if the Derogation Canon stood on sturdier ground, it was never meant to limit the scope of remedial statutes like Section 1983.

### (1) Legal scholars have criticized the Derogation Canon for over a century.

Legal scholars have found fault with the Derogation Canon since around the time of Section 1983's enactment—well before the *Pierson* Court used it to justify the creation of qualified immunity. This accumulated criticism casts further doubt on that doctrine.

The Canon reflects a trend in legal thought from the Founding era that common law should supersede statutory laws. Theodore Sedgwick, A Treatise on the Rules Which Govern the Interpretation and Construction of Statutory and Constitutional Law, 270 (2d ed. 1874). This notion, misplaced even at the time, has only fallen further out of fashion over the last two-and-a-half centuries. For example, only three years after Section 1983 was enacted, prominent scholar Theodore Sedgwick urged "modern courts and judges" to recognize that the Derogation Canon does not account for the "enormous changes in the relations between the courts and the Legislature which have taken place since the rule was promulgated." *Id.* Likewise, the *Pierson* dissent rejects "[a]ny argument" limiting Congress' ability to impose Section 1983 liability on state actors, because curtailing congressional powers in that manner would threaten core principles of federalism. 386 U.S. at 565

17

(Douglas, J., dissenting); *see also Monroe*, 365 U.S. at 171–72 (citations omitted). And decades later, Justice Scalia rejected the Derogation Canon outright as "a relic of the courts' historical hostility to the emergence of statutory law." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012).

Even today, jurists signal their discomfort with *Pierson*'s application of the Canon. One member of the Fifth Circuit acknowledged the Notwithstanding Clause as a clear expression of Congress' intent to make "[r]ights-violating state actors [] liable—period," chastising the *Pierson* Court for creating qualified immunity via "unwritten [] gap-filling." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring), *cert. denied* 601 U.S. 27 (2023). Justice Thomas similarly argued that the unfettered expansion of qualified immunity meant the Court was "no longer engaged in interpreting the intent of [the enacting] Congress." *Ziglar*, 582 U.S. at 159 (Thomas, J., concurring) (cleaned up). These contemporary critiques, which highlight how far qualified immunity has strayed from the intended text of Section 1983, only heighten the need to dismantle the doctrine altogether. Far from reflecting the primacy of statutory law, "qualified immunity precedents [] represent precisely the sort of freewheeling policy choice[s] that [the

18

Supreme Court] ha[s] previously disclaimed the power to make." *Id.* at 159–60 (cleaned up).

Each generation of criticism from scholars and judges makes increasingly clear that contemporary courts cannot legitimately invoke the Derogation Canon. Reinert, 111 CAL. L. REV. at 221. It was neither logical nor necessary for the *Pierson* Court to rely on the Canon. This Court, almost sixty years later, should not compound that germinal error by perpetuating a doctrine built on such shaky foundations.

> **(2)  The *Pierson* Court erred in applying the Derogation Canon to a remedial statute and using it to create a common-law defense.**

The Derogation Canon tainted the *Pierson* decision for a second reason: the Canon should not have been used to limit the scope of a remedial statute *or* to create a common-law defense.

To the first point, from Reconstruction to the time *Pierson* was decided, the Derogation Canon was not applied to incorporate common-law defenses into legislation "that obviously is of a remedial…character." *Isbrandtsen Co., Inc. v. Johnson*, 343 U.S. 779, 783 (1952); *see also* Reinert, 111 CAL. L. REV. at 227–28. The consequence for Section 1983 is straightforward. Section 1983 is a remedial statute. *See* Michael Sinclair, *"Only A Sith Thinks Like That": Llewellyn's "Dueling Canons," One to Seven*, 50 N.Y. L. SCH. L. REV. 919, 943 (2006). Remedial statutes must be "liberally and beneficently construed." CONG. GLOBE, 42d Cong., 1st

19

Sess. App. 68 (1871) (remarks of Rep. Shellabarger, sponsor of Section 1983); *see also* Matasar, at 765–69 & n.125; J.G. Sutherland, 2 STATUTES AND STATUTORY CONSTRUCTION § 400, at 510 (1st ed. 1891). And, as the Supreme Court explained, the Derogation Canon should not "defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure." *Isbrandtsen*, 343 U.S. at 783. These premises lead to an inescapable conclusion: because the Notwithstanding Clause embodied Congress' express decision to exclude immunity defenses from Section 1983, the Derogation Canon cannot be used to override that clear intent. The *Pierson* Court should never have applied the already-questionable Derogation Canon to "restrict[…the] rights" of those Section 1983 sought to protect. *Id.*

*Pierson* made matters worse by applying the Canon in a way that the Reconstruction Congress never would have anticipated or expected, further defying the intent of the legislators who enacted Section 1983. Courts had never previously used the Canon to conjure up such a defense against a remedial statute like Section 1983. Reinert, 111 CAL. L. REV. at 222. From the perspective of the Reconstruction Congress, the Canon's application was limited to statutes that created new procedural hurdles, facially interfered with common-law property rights, or displaced a common-law cause of action. *See id.* (compiling cases). On top of that, before *Pierson*, the Canon had functioned only to protect affirmative common-law *rights*—not to elevate common-law *defenses*. Reinert, 111

20

CAL. L. REV. at 222. For example, the Supreme Court affirmed the Third Circuit's conclusion that the Natural Gas Act did not displace a common-law contract right in *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956). The Eighth Circuit held that the Workmen's Compensation Act did not displace the common-law tort action for indemnity. *Am. Dist. Tel. Co. v. Kittleson*, 179 F.2d 946, 953 (8th Cir. 1950). And when a dog fight resulted in the death of one of the animals, the D.C. Circuit held that statute in the District of Columbia Code did not displace the common law's historical treatment of dogs as personal property for the purpose of tort damages. *Scharfeld v. Richardson*, 133 F.2d 340, 341–44 (D.C. Cir. 1942)*; see also* Reinert, 111 CAL. L. REV. at 207 n. 26.

Thus, even without the Notwithstanding Clause, the Reconstruction Congress would never have expected the Supreme Court to invoke the Derogation Canon to incorporate a common-law defense into Section 1983's liability scheme *sub silentio*. "Although background presumptions can inform the understanding of a word or phrase, those presumptions must exist at the time of enactment. We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted…years ago." *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020). The *Pierson* Court impermissibly broadened the Canon's reach to resuscitate an explicitly-abrogated common-law defense.

21

Legal thinkers have questioned the Derogation Canon—now more outdated than ever—for more than a century. The Supreme Court has forbidden its application to remedial statutes like Section 1983. All of this, alongside the revelatory discovery of the Notwithstanding Clause, makes the doctrine of qualified immunity ripe for reconsideration. Supreme Court precedent cannot stand when it is rooted in "erroneous historical narratives" and relies on reasoning that is "exceptionally weak." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 270, 231 (2022). *Pierson* must be overturned for both of these reasons.

## II. WOOLRIDGE IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Even if qualified immunity were a legitimate defense to Section 1983 actions, Woolridge was not entitled to it, and the district court erred in concluding otherwise. Woolridge performed a nude genital and body-cavity examination of a six-year-old child who was forcibly removed from his school by police officers without a warrant, parental notification, or parental consent. That's a textbook violation of Wright's and L.A.W.'s Fourth and Fourteenth Amendment rights, which are clearly-established under decades-old precedent from this Court. *See, e.g.*, *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th Cir. 2000); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1160–61, 1166–67 (9th Cir. 2018).

22

### A. Woolridge Violated Wright's and L.A.W.'s Fourth and Fourteenth Amendment Rights When He Examined L.A.W. Without Parental Notification or Consent.

The following facts are clear: Woolridge forced a six-year-old child, taken from his school by police officers, to completely undress and undergo an examination of his genitals and anus. 1-ER-007; 2-ER-287, 2-ER-290. L.A.W. endured that highly intrusive process—performed by a complete stranger—alone. His parents were never notified that law enforcement had taken L.A.W. without warning or that any medical examination at all would occur. 1-ER-002. And Woolridge examined L.A.W. without any judicial authorization whatsoever. 1-ER-002.

These undisputed facts establish two constitutional violations. First, Woolridge violated L.A.W.'s Fourth Amendment right to be free from unreasonable searches. Second, he violated L.A.W.'s Fourteenth Amendment rights: L.A.W.'s right to take refuge in the "love, comfort, and reassurance" of his family while an unfamiliar doctor probed his genitals, *Wallis*, 202 F.3d at 1141–42, and his parents' right to be involved in the "care, custody, and control" of their child, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Wallis*, 202 F.3d at 1141–42. Even though the district court skipped over this analysis, this Court should squarely hold that Woolridge's examination violated the Constitution.

23

### (1) Woolridge's examination was an unreasonable, warrantless search in violation of the Fourth Amendment.

Woolridge's examination violated L.A.W.'s right to be free from "unreasonable searches." U.S. Const. amend. IV. Investigatory medical examinations by state officials—even those far less intrusive than a full-blown anal and genital examination—constitute searches under the Fourth Amendment. *Ferguson v. City of Charleston*, 532 U.S. 67, 76 & n.9 (2001); *see also Mann*, 907 F.3d at 1164. That's for good reason. Unwanted medical examinations violate legitimate expectations of privacy, *Yin v. California*, 95 F.3d 864, 871 (9th Cir. 1996), especially where they involve intimate areas of the body—"the most basic subject of privacy," *Ioane v. Hodges*, 939 F.3d 945, 956 (9th Cir. 2018). Absent judicial authorization, parental consent, or exigent circumstances, exams like the one Woolridge performed are "per se unreasonable" and therefore unconstitutional. *Katz v. United States*, 389 U.S. 347, 357 (1967).

None of these three exceptions is present here. Woolridge freely admits that he did not seek—much less obtain—parental consent before examining L.A.W., meaning that L.A.W.'s mother and father couldn't be there to support him. 1-ER-002, 2-ER-290, 2-ER-300. And Woolridge did not request—much less obtain—a court order authorizing the examination. 1-ER-002.

Nor was there any exigency that might have excused Woolridge's conduct. L.A.W. had no pressing medical condition necessitating

24

immediate treatment. 2-ER-290. There was no imminent risk of physical or other harm to him. 2-ER-291–92. And no one—not the school nurse, not the detectives, and not Woolridge himself—had made any allegations of sexual abuse. 2-ER-290. *Cf. Mann*, 907 F.3d at 1166. Police officers abruptly removed L.A.W. from school simply because the school nurse noticed a single, "superficial" bruise on his leg. 2-ER-290–91. An intrusive genital and anal examination was not remotely necessary under these circumstances.

### (2) Woolridge violated Wright's and L.A.W.'s Fourteenth Amendment rights to privacy and family association.

Woolridge's examination also violated L.A.W.'s and his father's fundamental liberty interests in family association under the Fourteenth Amendment.

At the outset, recognizing that unfamiliar medical procedures can be traumatizing for children, this Court has long held that minors have a right to have a family member present when receiving medical treatment. *Wallis*, 202 F.3d at 1141–42; *see also Mann*, 907 F.3d at 1160–61. And a child's right to shelter in the "love, comfort and reassurance of their parents" is "particularly compelling" when the examination is "invasive or upsetting." *Wallis*, 202 F.3d at 1141–42. The violation of this right could not be clearer. L.A.W. was taken to an unfamiliar place with no guardian present. 1-ER-007. Woolridge, a total stranger, forced to L.A.W. to completely undress. 2-ER-290. He examined L.A.W.'s genitals,

spread his buttocks, and then prodded the inside of his anus. 2-ER-290. It's hard to imagine something more upsetting to a six-year-old child. And L.A.W. endured it alone.

For all the same reasons, Woolridge violated Wright's Fourteenth Amendment right to be with his child during the examination. *See Wallis*, 202 F.3d at 1142. Wright was never notified that Woolridge would probe his son's body for supposed evidence of abuse. He was therefore functionally precluded from being present for L.A.W. A parent is entitled to support his son in such circumstances.

Finally, Wright obviously did not consent to the examination because no one told him it was going to occur. 1-ER-002. Failing to obtain Wright's consent violated both his "right…to make important medical decisions for [his] child[]" and L.A.W.'s corresponding right "to have those decisions made by [his] parents rather than the state." *Wallis*, 202 F.3d at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 604 (1979)); *see also Mann*, 907 F.3d at 1161–62.

As with L.A.W.'s Fourth Amendment rights, Woolridge cannot escape Fourteenth Amendment liability by invoking some imagined exigency never presented to the district court and apparent nowhere in the record. The exam wasn't necessary to protect L.A.W.'s health or safety. It wasn't needed to preserve any evidence. And it certainly did not protect L.A.W. from any future harm.

## B. L.A.W.'s and Wright's Fourth and Fourteenth Amendment Rights Were Clearly Established.

The district court erred when it held that Woolridge was entitled to qualified immunity; contrary to the district court's conclusion, the Fourth and Fourteenth Amendment rights at issue were clearly established at the time of the examination. 1-ER-018. This Court's caselaw would have put *any* reasonable official in Woolridge's position on notice that a warrantless genital and body-cavity search of a six-year-old child was unlawful absent parental notification and consent.

The "clearly-established" inquiry is familiar. The second prong of qualified immunity is satisfied when the "contours of the right" are "sufficiently clear that a reasonable official would understand that what [she] is doing violates that right." *Ioane*, 939 F.3d at 956 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiffs need not identify "a case directly on point." *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022) (cleaned up); *see also Stanton v. Sims*, 571 U.S. 3, 6 (2013). Rather, the relevant inquiry is whether the state of the law *as a whole* gave the official fair warning that their conduct was unconstitutional. *Ballentine*, 28 F.4th at 66; *see also Elder v. Holloway*, 510 U.S. 510, 512, 516 (1994) (holding that the clearly-established inquiry should be conducted *de novo* and consider relevant circuit court precedent).

This Court's opinion in *Wallis* clearly established Wright's and L.A.W.'s Fourth and Fourteenth Amendment rights. The Constitution, *Wallis* held,

27

> assures parents that, in the absence of parental consent, [examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances.

*Wallis*, 202 F.3d at 1141 (cleaned up); see also *Mann*, 907 F.3d at 1160–61, 1164 (cleaned up). This is not the sort of "extremely abstract" right the clearly-established standard is designed to protect officials against. *Cf. Ziglar*, 582 U.S. at 151. It's a crystal-clear standard of conduct that, on its face, applies to *all* state officials. This Court has confirmed the core principles that *Wallis* set forth time and time again. *See Mann*, 907 F.3d at 1160-62; *Greene v. Camreta* 588 F.3d 1011, 1036 (9th Cir. 2009), *vacated in part on other grounds* in 563 U.S. 692 (2011) *and* 661 F.3d 1201 (9th Cir. 2011) (recognizing "clearly established [Fourteenth Amendment] familial rights to be with each other during potentially traumatic medical examinations"); *Doe v. Lebbos*, 348 F.3d 820, 828 (9th Cir. 2003), *overruled on other grounds by Beltran v. Santa Clara Cnty.*, 514 F.3d 906 (9th Cir. 2008) (social worker violated parent's and child's Fourth and Fourteenth Amendment rights by "referring [the child] for an intrusive sexual abuse examination without parental consent or a court order").

Of course, this bedrock law applies on its face to Woolridge's conduct. But even setting that aside, the striking factual similarities

between the medical exam in *Wallis* and the one in this case were more than enough to put Woolridge on notice that his conduct was unlawful. In *Wallis*, as here, the medical "evidentiary physical examination of [the] children" was ordered by a detective for the claimed purpose of "determin[ing] whether [the] child[ren] had been sexually abused." *Compare Wallis*, 202 F.3d at 1134–35, *with* 1-ER-017–18; 3-ER-367. In *Wallis*, as here, there was no reliable evidence of abuse. *Compare Wallis*, 202 F.3d at 1135, *with* 2-ER-289–90. In *Wallis*, as here, "[n]o court order was obtained prior to th[e] examination[.] Nor were the parents notified in advance that the examinations would be conducted." *Wallis*, 202 F.3d at 1134–35; *see* 1-ER-002, 1-ER-007. And in *Wallis*, as here, the examinations at issue "included internal body cavity examinations of the children," which involved having a stranger conduct an intimate examination of their genital and anal areas and photograph "both the inside and outside" of those areas of their body. *Wallis*, 202 F.3d at 1134–35; *see* 2-ER-290.

The district court did not meaningfully contest any of these comparisons. Instead, it awarded qualified immunity to Woolridge largely because Woolridge is a doctor, not a social worker, caseworker, or police officer, and—in the district court's view—*Wallis* and *Mann* "do not address the liability of a *doctor* performing medical examinations." 1-ER-018 (emphasis added). But that conclusion ignores this Court's decision

29

in *Jones v. County of Los Angeles*, 802 F.3d 990 (9th Cir. 2015), which the district court neither cited nor considered.[5]

*Jones* involved a physician, Dr. Wang, who—just like Woolridge—conducted a medical examination on a child seized from her parents on suspicion of child abuse. *Id.* at 995–96. After concluding that Wang's examination violated the parents' and child's Fourth and Fourteenth Amendment rights, this Court squarely held that "this case" was *not* "distinguishable from the general [*Wallis*] rule" simply "because Dr. Wang is a physician investigating child abuse rather than a social worker." *Id.* at 1003–05, 1007. "It is well-settled," this Court explained,

> that the immunity to which a public official is entitled depends not on the official's title or agency, but on the nature of the function that the person was performing when taking the actions that provoked the lawsuit.

*Id.* at 1007 (cleaned up). Because Wang, just like Woolridge, 3-ER-367, "was investigating child abuse in her capacity as [a] medical director" of an investigatory entity, *id.*, she was on clear notice that *Wallis* applied to her conduct just as readily as it applies to police officers, social workers, and caseworkers. Precisely the same logic applies here. The district court's qualified-immunity rationale cannot survive *Jones*.

---

[5] *Jones* was superseded on other grounds in *Jones v. County of Los Angeles*, 722 F. App'x 634 (9th Cir. 2018). That unpublished decision did not disturb the holding with respect to *Wallis*, concluding only that Dr. Wang—who observed severe skull and rib fractures in the child she examined—was entitled to qualified immunity on potential exigency grounds entirely absent from this record. *Id.* at 637–38.

"It does not require a constitutional scholar to conclude that a nude search of a [] child is an invasion of constitutional rights of some magnitude." *Wallis*, 202 F.3d at 1141 n.11 (cleaned up). The Fourth and Fourteenth Amendment rights of children and their parents had been clearly established for decades when L.A.W. endured an extraordinarily intrusive examination. In short, Woolridge "received [his] fair notice and squandered it." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 677 (9th Cir. 2021) (cleaned up). He is not entitled to qualified immunity.

## CONCLUSION

Amicus curiae respectfully requests that this Court reverse the district court's grant of qualified immunity to Woolridge.

Date: April 11, 2025                Respectfully submitted,


                         s/ Emma Freeman
                         Emma Freeman
                            *Counsel of Record*
                            *Supervising Attorney*
                         Adam W. Hansen
                         CIVIL RIGHTS APPELLATE LAW CLINIC
                         UNIVERSITY OF MINNESOTA
                            LAW SCHOOL
                         229 19th Ave. S.
                         (646) 363-6766
                         emma@apollo-law.com

                         Madeleine L. Kim
                         Nolan Meghrouni-Brown
                         *Certified Student Attorneys*

                         *Counsel for Amicus Curiae*

31

## **CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) that the Brief of amicus curiae Professor Alexander A. Reinert complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this Brief contains 7,191 words, in other words, no more than 7,500 words, including footnotes and excluding the parts of the motion exempted by Fed. R. App. P. 32(f). In addition, this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century Schoolbook font in 14 point size, with footnotes in Century Schoolbook font in 14 point size.

Date: April 11, 2025        s/ Emma Freeman
                                      Emma Freeman

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 11th day of April, 2025, I caused the foregoing brief to be filed electronically with the Court, where it is available for viewing and downloading from the Court's ACMS system, and that such electronic filing automatically generates a notice of electronic filing constituting service. I certify that all parties required to be served have been served.

Date: April 11, 2025                    s/ Emma Freeman
                                        Emma Freeman