**No. 24-6668**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Brian Wright,

*Plaintiff-Appellant,*

v.

Gerardo Talamantes, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. 4:21-cv-00257-JGZ
Hon. Jennifer Zipps

---

**APPELLANT'S CONSOLIDATED REPLIES TO APPELLEE DALE
WOOLRIDGE'S ANSWERING BRIEF AND DCS APPELLEES'
ANSWERING BRIEF**

---

Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326 #119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com

*Attorney for Appellant Brian Wright*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………………... v

REPLY TO ANSWERING BRIEF OF WOOLRIDGE ……………………..… 1

   I.    WOOLRIDGE CONCEDES HE ACTED AS A WILLFUL
        PARTICIPANT IN THE UNCONSTITUTIONAL STRIP SEARCH OF
        THE CHILD: THIS COURT MUST HOLD WOOLRIDGE ACTED
        UNDER COLOR OF LAW ……………………………………………1

   II.   AT THE TIME OF ENACTMENT OF SECTION 1983, NO COMMON
        LAW IMMUNITY ATTACHED TO A DOCTOR'S ACTIONS WHILE
        ACTING FOR THE STATE. QUALIFIED IMMUNITY IS
        UNAVAILABLE TO WOOLRIDGE …………………………….….... 2

   III.  WOOLRIDGE, FUNCTIONING AS A CRIMINAL INVESTIGATOR,
        IS NOT ENTITLED TO QUALIFIED IMMUNITY ……………........ 6

CONCLUSION ……………………………………………………….….... 11

REPLY TO ANSWERING BRIEF OF DCS APPELLEES ……………..… 11

SUMMARY OF ARGUMENT……………………...………………….……. 11

ARGUMENT OF LAW…………………………………………….............. 12

   I.  APPELLEES INSIST ON DRAWING THEIR ARGUMENT FROM
      FACTS AND INFERENCES IN THEIR FAVOR, HENCE, IN
      OPPOSITION TO THEIR OBLIGATION ON REVIEW……..……..…12

   II.  TALAMANTES AND FRANCISCO HAVE FAILED TO PROVE
      ISSUE PRECLUSION…………………………………………….... 14

A. Standard of Review……………………………………….…..... 14

B. The Court Should Decline to Consider Issue Preclusion ……...…..... 14

C. Securing the CAR: The Seventeenth Claim……………………..... 16

D. The Nineteenth Claim Is Not Barred……………….…………......… 20

III.  THE SUBSTANTIVE QUESTIONS: APPELLEES' EVIDENCE
     FAILS TO PROVE THE ABSENCE OF MATERIAL QUESTIONS
     OF FACT ON JUDICIAL DECEPTION ……………………………… 22

A. This Court Must Review the Appellees' Submissions in Their
   Totality: The Impact is Greater Than the Sum of Allegations
   Analyzed in Isolation ……………………………………….…..... 22

B. The Duty of the Team to Uncover Facts Which Refute
   Allegations of Abuse, and Francisco's Integral Participation ……….. 23

C. The Seventeenth Claim: Application for CAR:
   Misrepresentations and Material Omissions ……………………..…….24

   1. There were no "multiple lesions" attributable to physical abuse
      and Talamantes and Francisco were reckless in the allegation …... 24

   2. That L.A.W. "disclosed that his stepmother regularly uses
      physical discipline … [and] uses objects, to include the belt
      and a Hot Wheels racing track, to discipline him"……….…….... 27

   3. The allegation of an "on-going" investigation of Brian and
      Irlanda ………………………………………………………..… 29

   4. The allegation that L.A.W. suffered "serious or severe harm"
      from "deliberate" acts of his stepmother …………………........… 31

   5.  Brian's alleged concessions of the extent of injuries and
      Irlanda's responsibility ………………………………….…..... 32

D. The Nineteenth Claim: Judicial Deception in the Dependency
   Petition Filings ……………………………………………………… 35

CONCLUSION………………………………………………………… 36

CERTIFICATE OF COMPLIANCE …………………………………...… 37

CERTIFICATE OF SERVICE ……………………………..…………… 38

# TABLE OF AUTHORITIES

**CASES**                                                       **Page(s)**

*Awabdy v. City of Adelanto,*
    368 F.3d 1062, 1067 (9th Cir. 2004) …………………………………… 35

*Beck v. Buckland,*
    527 F.3d 853, 862 (9th 2008) ……………………………………..… 35

*Campbell v. SZL Properties Ltd.,*
    204 Ariz. 221, 223, ¶ 9 (App. 2003) …………………….…….…. 14

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 323 (1986) ……………………………….…... 12

*Circle K Corp. v. Industrial Comm'n,*
    179 Ariz. 422, 425, 880 P.2d 642 (Ariz. App. 1993) …………..……. 15

*City of Riverside v. Rivera,*
    447 U.S. 561, 574-75 (1986) ……………………………….……..…16

*Costanich v. Dept. of Soc. & Health Svcs.,*
    627 F.3d 1101, 1113 (9th Cir. 2009) …………...……. 13, 16, 17, 18, 19, 20

*Deeths v. Lucile Slater Packard Children's Hospital,*
    2013 U.S. Dist. LEXIS 83457 *33 (E.D. Cal. June 13, 2013) …..…….. 19

*Dodson v. County of L.A.,*
    2021 U.S. Dist. LEXIS 196977 (C.D. Cal., June 24, 2021) …..…….... 21

*Dodson v. Cnty. of Los Angeles,*
    2022 U.S. App. LEXIS 23960 (9th Cir. August 25, 2019) …..…….…... 21

*Dunkle v. Dale,*
    58 F. Supp. 3d 959 (D. Ala. 2014). ……………………………. 17, 18, 19

*Dunkle v. Dale,*
    668 Fed. Appx., 254, 255 (9th Cir. 2016) ………..……. 17, 18, 19, 20, 21

*Dupuy v. Cain*,
  201 F.3d 582, 589 (5th Cir. 2000) …………………….…………….. 13

*Ferris v. Hawkins,*
  135 Ariz. 329, 333, 660 P.2d 1256, 1261 (Ariz. App. 1983) ……….....…15

*Filarsky v. Delia,*
  566 U.S. 377, 132 S. Ct. 1657, 182 L. Ed. 2d 662 (2012) …………... 4, 5

*Galario v. Adewundmi*,
  2009 U.S. Dist. LEXIS 38085 (D. Haw. May 1, 2009) …………..……..19

*Garner v. Mojave County,*
  2016 U.S. Dist. LEXIS 21045**8-9 (D. Ariz. February 22, 2016)……...4

*Grimes v. Ayerdis,*
  2018 U.S. Dist. LEXIS 132061 (N.D. Cal. August 6, 2018) ….…….… 21

*Janjua v. Neufeld,*
  933 F. 3d 1061, 1066-67 (9th Cir. 2019) ………….…………….….... 17

*Jensen v. Lane County,*
  222 F.3d 570, 576 (2000) …………………………………… 2, 3, 4, 5, 6

*Jones v. County of Los Angeles,*
  802 F.3d 990 (9th Cir. 2015) ("Jones I") ……………….………7, 8, 10

*Jones v. County of Los Angeles,*
  722 Fed. App'x 634 (9th Cir. 2018) ("*Jones II*") ………….…….. 8, 9, 10

*Kasdan v. County of Los Angeles,*
  2014 U.S. Dist. LEXIS 165098
  *12 (C.D. Cal. November 24, 2014) ………………………....……. 20, 21

*Kirkpatrick v. County of Washoe,*
  843 F.3d 784, 793 (9th Cir. 2016) …………………………………...… 9

*Liston v. County of Riverside,*
  120 F.3d 965, 973 (9th Cir. 1997) …………………….…..……... 22

*Lowe v. City of Monrovia*,
    775 F.2d 998, 1008-09 (9th Cir. 1985); ………………….…….. 13

*Mabe v. San Bernadino County*,
    237 F.3d 1101, 1106 (9th Cir. 2001) …………………………….. 6

*Mann v. County of San Diego*,
    907 F.3d 1154 (9th Cir. 2018) …………………………………... 1

*McCullum v. Tepe*,
    693 F.3d 696, 703 (6th Cir. 2012) …………………………….… 3

*Newman v. Piggie Park Enterprises Inc*.,
    390 U.S. 400, 402 (1968) , 390 U.S. 400, 402, 88 S. Ct. 964, 19 L.
    Ed. 2d 1263 (1968) ……………………………………….……… 15

*Perniciaro v. Lea*,
    901 F.3d 241 (5th Cir. 2018) ………………………………….… 5

*Reeves v. Sanderson Plumbing Prods., Inc*.,
    530 U.S. 139, 151,120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ……..… 13

*Richardson v. McKnight*,
    *521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997)*…………....... 3

*Russell v. Lumitap*,
    31 F. 4th 729 (9th Cir. 2022) …………………………….…..… 9, 10

*Scanlon v. County of Los Angeles*,
    92 F. 4th 781, 793 (9th Cir. 2024) …………………....………. 23, 32, 34

*Smith v. Banner Health Sys.*,
    621 F. App'x 876 (9th Cir. 2015) …………………….….….….… 20
.
*Smith v. CIGNA HealthPlan of Ariz.,*
    203 Ariz. 173, ¶ 21, 52 P.3d 205, 211 (App. 2002) ………..…….…....15

*Takahashi v. United States*,
    143 F.2d 118, 122 (9th Cir. 1944) …………………………..…. 13

*Tanner v. McMurray,*
    989 F.3d 860 (10th Cir.) …………………………………….. 3

*T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n,*
    809 F.2d 626, 630 (9th Cir. 1987) ……………………….…….. 13

*United States v. Stanert,*
    762 F.2d 775, as amended, 769 F.2d 1410 (1985) ………….…...….. 22

*Wallis v. Spencer,*
    202 F.3d 1126, 1141 (9th Cir. 2000) ………………………... 1, 8, 9

*Wyatt v. Cole,*
    504 U.S. 158, 164, 118 L. Ed. 2d 504, 112 S. Ct. 1827 (1992) …..… 2

## Statutes

42 U.S.C. Section 1983 ……………………….……... 1, 2, 12,15, 17, 35

A.R.S. § 8-456(D)(1) …………………………..…………..…… 23

## Treatises

9 A. C. Wright & A. Miller, Federal Practice and Procedure § 2529 at
    299 (2d ed. 1995). …………………………..…..…..….. 13

**REPLY TO ANSWERING BRIEF OF APPELLEE WOOLRIDGE**

**I.  WOOLRIDGE CONCEDES HE ACTED AS A WILLFUL PARTICIPANT IN THE UNCONSTITUTIONAL STRIP SEARCH OF THE CHILD: THIS COURT MUST HOLD WOOLRIDGE ACTED UNDER COLOR OF LAW**

Appellee concedes, by omission, that this Court's authorities holding a putatively private party to answer for his actions under Section 1983, are met in this record.

The consequences of this are determinative of this appeal.

First, this Court's holding that Woolridge is a state actor, the only holding that can be made, means as well that unless his conduct of the unconsented strip search of L.A.W. is excused by an affirmative defense, the District Court's denial of Mr. Wright's Motion for Partial Summary Judgment, Doc. 424, at 1 ER 0002-18, was error.

Woolridge contests no facts. He collaborated with Sahuarita Police detective Johnston to collect evidence from the body of the child to further a criminal child abuse investigation. He had neither parental consent, nor a court order authorizing such an invasive action. Neither the potential for the dissipation of evidence before a court order could be secured, nor an urgent medical need existed. The conduct violated both parent and child's rights under the Fourteenth and Fourth Amendments. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *Mann*

1

*v.County of San Diego*, 907 F.3d 1154 (9th Cir. 2018).

## II.    AT THE TIME OF ENACTMENT OF SECTION 1983, NO COMMON LAW IMMUNITY ATTACHED TO A DOCTOR'S ACTIONS WHILE ACTING FOR THE STATE. QUALIFIED IMMUNITY IS UNAVAILABLE TO WOOLRIDGE.

As we pointed out in the Opening Brief, the Supreme Court teaches that every analysis of a claimed access to the affirmative defense of qualified immunity proceeds from the asking of this essential question: would the person asserting qualified immunity have been immune from liability under the common law in 1871 when Congress passed the law later codified as Section 1983? Put another way, was there a "firmly rooted tradition" of immunity at the time of enactment?

This Court, observing that Section 1983 creates a "species of tort liability that on its face admits of no immunities," quoting from *Wyatt v. Cole,* 504 U.S. 158, 164, 118 L. Ed. 2d 504, 112 S. Ct. 1827 (1992), further quoted *Wyatt's* teaching that "the Court nonetheless accords qualified immunity where a tradition of immunity was so firmly rooted in the common law *and* was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Jensen v. Lane County,* 222 F.3d 570, 576 (2000) (emphasis added: citations omitted).

Woolridge, again, by omission, concedes that the historical record refutes immunity existed for a doctor working for the state in *any* capacity. *See,*

2

*e.g., Tanner v. McMurray*, 989 F.3d 860 (10th Cir.) ("the precedents that do exist point in one direction: there was no special immunity for a doctor working for the state.") *citing McCullum v. Tepe*, 693 F.3d 696, 703 (6th Cir. 2012). That lack of immunity applied to doctors whether they performed full time for the state or only *ad hoc*. *Id.,* at 870.

On this finding, there is no reason to consider policy arguments. Woolridge has presented no evidence that strong policies existed as of 1871 that would justify extending qualified immunity to categories of actors who had no such immunity.

The Opening Brief invited Woolridge to present evidence favoring his resort to qualified immunity. He presents no evidence, but only argument untethered to the record and disingenuous by design or oversight. If availability of qualified immunity turned on the amount of money the private party could realize from assuming the function of a criminal investigator, surely Woolridge would have made a point to proffer that evidence.

Further, argues Woolridge, "'insurance, indemnification agreements and higher pay' would appear no more likely to address problems of timidity and discouraging qualified candidates than they would if Dr. Woolridge were a full-time employee of SACAC." *Id*. And, "unlike *Jensen* and *Richardson*[1], there are no

---

[1] Richardson v. McKnight, 521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997)

3

other medical providers who would readily organize to replace SACAC…." *Id.*

Similar arguments were made by the defendant Dr. Robbins in *Jensen*, but this Court observed that, "Dr. Robbins has not presented evidence that these market forces are inapplicable or inadequate here…." 222 F. 3d at 578. Woolridge presented no evidence that (1) market forces, insurance or the availability of indemnity agreements are insufficient; (2) that other potential competitors of SACAC would have to "readily organize" to replace the corporation; nor (3), that having to defend his and his Associate Directors' conduct of these intrusive strip searches would discourage these doctors from continuing this work, or impel SACAC to withdraw from the Protocols. All Woolridge has done is invite this Court to endorse argument in the absence of evidence. The Court should reject this.

Woolridge cites to decisions from other circuits, including incomplete citations to unreported District Court decisions, in support of his arguments. Those decisions are hardly on point or persuasive. In this Circuit, in *Garner v. Mojave County,* 2016 U.S. Dist. LEXIS 21045**8-9 (D. Ariz. February 22, 2016) the Court analyzed this Court's *Jensen* line of cases in light of *Filarsky*[2] and collected those cases from other circuits in which doctors functioning similarly to Woolridge were precluded from raising the defense, concluding that the *Filarsky* analysis

_____

[2] Filarsky v. Delia, 566 U.S. 377, 132 S. Ct. 1657, 182 L. Ed. 2d 662 (2012).

4

creates only a narrow path to qualified immunity not available to a private doctor in Woolridge's position. Those cases are directly on point.

Indeed, Woolridge's discussion of *Perniciaro v. Lea*, 901 F.3d 241 (5th Cir. 2018) displays a fundamental misapprehension of the distinction between the *Jensen* analysis and that of *Filarsky*. In *Pernicario*, the two doctors, Nicholl and Thompson, worked within the mental health facility owned and operated by the Louisiana Department of Health. They worked in tandem with, and supervised, state employees and their responsibility was not to engage in criminal investigation on behalf of law enforcement, but simply to deliver mental health care to patients of the institution. *Id.,* at 247. These facts distinguish that case from *Jensen,* but even so from *Filarsky. Filarsky* held only that a private lawyer, undertaking temporary duties on behalf of the state, was entitled to assert qualified immunity. The history of the treatment of doctors at common law, and the absence of common law immunities, was never before the Court. *Pernicario,* in which the textual history is notable by its absence, is not persuasive as even the analysis conflicts with *Jensen.*

Perhaps the most disingenuous assertion made is that "There is no dispute that a doctor employed directly by law enforcement or DCS on a full-time basis to conduct similar medical examinations would be entitled to seek the protection of qualified immunity." Doc. 14 at 5. For that proposition, Woolridge cites *Filarsky,*

5

566 U.S. 394-395. But the only statement made by the Court remotely on such a point was that the City "must rely on the occasional services of private individuals such as Filarsky." The law addressed in the Opening Brief, and herein, confirms that Woolridge's claim is simply wrong. Woolridge advocates a rule that *every* private party state actor is automatically entitled to qualified immunity if the state could hire him as a W-2 employee to engage in the same conduct. In short, *no* resort to history or policy is necessary, and the entirety of the case law is of no consequence. This is the end point of Woolridge's argument carried to its logical conclusion.

*Jensen* remains the touchstone. Affirmance of the District Court's holding would be nothing less than a repudiation of the *Jensen* analysis. That, it is submitted, is for this Court *en banc,* if at all.

## III. WOOLRIDGE, FUNCTIONING AS A CRIMINAL INVESTIGATOR, IS NOT ENTITLED TO QUALIFIED IMMUNITY

As was suggested in the Opening Brief, the substance of Woolridge's claim to immunity is based on his title, a physician in private practice. He fails to acknowledge this Court's teaching in *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106 (9th Cir. 2001) that "the immunity to which a public official is entitled depends not on the official's title or agency, but on the nature of the function that the person was performing when taking the actions that provoked the lawsuit."

6

What is really not in reasonable dispute is that, by 2020 it was clearly established that state actors engaged in the practice of collecting evidence off a child's body, to further a criminal investigation, without consent or a court order, violates parent and child's constitutional rights. This is not some general proposition, as Woolridge would have the Court accept, but a matter of specificity the knowledge of which the authorities hold all state officials engaged in the same activities are deemed to know.

As a state actor, Woolridge was no longer a private party, but a criminal investigator, and held to that same knowledge. This is the reasoning in *Jones v. County of Los Angeles*, 802 F.3d 990 (9th Cir. 2015) ("*Jones I*"). Woolridge claims that Mr. Wright forfeited his right to this argument because it was not brought to the attention of the District Court. Woolridge's counsel has either failed to read the record or engaged in some sleight of hand here. The question of qualified immunity came before the District Court in a most unusual manner.

Woolridge's motion for summary judgment on qualified immunity was based entirely on state law, Doc. 297, and was denied by the District Court, Doc. 361. Mr. Wright filed his Motion for Partial Summary Judgment, Doc. 283, and Woolridge's response made no mention of qualified immunity, Doc. 296.

It was only on May 23, 2024, when Mr. Wright's Motion came on for oral argument that Woolridge's counsel first raised federal qualified immunity. The

7

transcript of that argument is at Doc. 435, FER Volume 1, 002-063. When the District Court announced that it would hear the untimely argument, the undersigned responded, in part, as follows:

> MR. MOORE: Okay. First, your Honor, the Supreme Court has held that private individuals in the status of Dr. Woolridge are not entitled to qualified immunity. They don't even get to raise it…. If Mr. Slutes had raised that issue in his motion, I would have addressed it. But more importantly, your Honor – THE COURT: So are you saying that if he is a State Actor, he's entitled to the asserted defense of qualified immunity?

> MR. MOORE: No. He can be a State Actor as a private individual, but he does not get to assert qualified immunity. But let me just refer the Court to a case which really resolves this issue. *Jones versus County of Los Angeles*, 802 F.3d 990, 802 F.3d 990. That addressed the qualified immunity argument by the doctor in the same situation as Dr. Woolridge. And the Court held that the doctor was not entitled to qualified immunity.

There was more discussion of *Jones I* following that passage. The District Court was fully apprised of Mr. Wright's argument and the cases.

As to the substance of Woolridge's argument, it is true that *Jones I* was superseded by *Jones v. County of Los Angeles,* 722 Fed. App'x 634 (9th Cir. 2018) ("*Jones II*") but not for the reason claimed by Woolridge. That unpublished decision did not disturb the reasoning with respect to *Wallis*, concluding only that Dr. Wang—who observed severe skull and rib fractures in the child she examined—was entitled to qualified immunity on potential exigency grounds entirely absent from this record. *Id*. at 637–38. As of 2008, this Court had held in

8

*Kirkpatrick v. County of Washoe,* 843 F.3d 784, 793 (9th Cir. 2016) that "No Supreme Court precedent defines when a warrant is required to seize a child under exigent circumstances." Nor was there any Ninth Circuit authority on that question. *Jones II's* ruling that Dr. Wang was entitled to qualified immunity was not grounded on her being a private physician, but on *Kirkpatrick's* holding that not every state official at the time of the exigent removal would have known that seizing a child, who had diagnosed injuries of such severity, violated the child's rights. In fact, this Court distinguished *Wallis* from the facts before it. *Jones II*, at 637. Dr. Wang was held to the same standard as any state official, but the violation was simply not clearly established. Not so in this case.

The correct analysis was also applied in *Russell v. Lumitap*, 31 F. 4th 729 (9th Cir. 2022). *Russell* came before this Court on interlocutory appeal by a doctor, Dr. Le, and two nurses, Teofilo and Lumitap, contesting the trial Court's denial of their motion for summary judgment on qualified immunity. The Russells asserted that these medical defendants had violated the Fourteenth Amendment right of their son, who died while being held after arrest, to the minimum standard of medical care required under the Constitution. *Id.*, at 738-739. The medical defendants were employed to provide the medical care in the facility. The District Court concluded that the facts developed by the plaintiffs met the test of deliberate indifference to the son's substantial risk of serious harm, and that the right was

9

clearly established. *Id.*, at 740-741.

This Court framed the inquiry as follows: "to defeat qualified immunity the plaintiffs must show that, given the available case law at the time, a reasonable official, knowing what Dr. Le, Nurse Teofilo, Nurse Trout, and Nurse Lumitap knew, would have understood that their actions presented such a substantial risk of harm to [Russell] that the failure to act was unconstitutional." *Id.*, at 740 (citation omitted).

Affirming denial of qualified immunity as to three of the four medical defendants, this Court reasoned, as to Dr. Le, that

> Under these circumstances, taking the facts most favorably to the plaintiffs, Dr. Le could not have reasonably believed based on the clearly established law as it stood then that he could provide constitutionally adequate care without even examining a patient with Russell's symptoms who had not responded to a dose of nitroglycerin. Therefore, the district court was correct in denying summary judgment on qualified immunity to Dr. Le.

*Id.*, at 743.

The teaching of *Jones I, Jones, II*, and *Russell* stand in stark contrast to the argument presented by Woolridge. This Court's holding can, and it is submitted, should read:

> Under these circumstances, taking the facts most favorably to Mr. Wright, Dr. Woolridge could not have reasonably believed based on the clearly established law as it then stood that his unconsented forensic examination of L.A.W. which included the visual body cavity search, was constitutionally permissible. Therefore, the district court was

incorrect in granting summary judgment on qualified immunity to Dr. Woolridge.

## CONCLUSION

For the reasons put forth in the Opening Brief, and in this document, Appellant Brian Wright respectfully reasserts his right to this Court's reversal and remand of the case against Dr. Woolridge, and an Order directing entry of judgment on liability in favor of Mr. Wright.

## REPLY TO ANSWERING BRIEF OF DCS APPELLEES TALAMANTES AND FRANCISCO

### SUMMARY OF ARGUMENT

Having read Talamantes and Francisco's Answering Brief, this Court no doubt understands that these Appellees stake their hope for affirmance not on the substantive question of judicial deception, but, instead, on their affirmative defense. We address this argument first.

To begin, there is a suggestion in the argument that claim preclusion applies. However, because Talamantes and Francisco only identify issue preclusion as the affirmative defense asserted, we do not address claim preclusion.

Appellees' argument as to issue preclusion has been repeatedly rejected by this Court. A reading of the Under Advisement ruling in the dependency case – which is the *only* relevant evidence - confirms that whether any specific allegation

11

made by Appellees was false, and made recklessly or intentionally, was *not* adjudicated in the dependency case, nor were material omissions even addressed. Further, determination whether any specific allegation made by Talamantes and Francisco was false was not essential to the dependency outcome. Finally, it would frustrate the overriding policy embodied in Section 1983 to consider the defense. Hence, there is no issue preclusion.

As to the substance, Appellees have failed to prove that there is no question of material fact as to the critical misrepresentations and omissions set out in support of the Seventeenth Claim, securing the *ex parte* CAR Order. Nor is the record void of substantial evidence on the Nineteenth Claim, securing the *ex parte* Temporary Orders.

Summary judgement was, consequentially, improperly granted, and this Court should reverse and remand for a trial.

## ARGUMENT OF LAW

## I. APPELLEES INSIST ON DRAWING THEIR ARGUMENT FROM FACTS AND INFERENCES IN THEIR FAVOR, HENCE, IN OPPOSITION TO THEIR OBLIGATION ON REVIEW

It is axiomatic that the Appellees have the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On this Court's *de novo* review, (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the Appellees; and

12

(2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to Brian Wright. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Indeed, *Reeves* teaches that this Court must disregard all evidence favorable to the Appellees that it is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 139, 151,120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), citing 9 A. C. Wright & A. Miller, Federal Practice and Procedure § 2529 at 299 (2d ed. 1995).

This teaching is of heightened significance in cases, as here, the dispositive issue of intent is "a pure question of fact" that is "to be left to the trier of fact." *Lowe v. City of Monrovia*, 775 F.2d 998, 1008-09 (9th Cir. 1985); *see Takahashi v. United State*s, 143 F.2d 118, 122 (9th Cir. 1944) ("Questions of knowledge and intent are always questions of fact for the jury."). Because intent is a question of fact, a jury may infer that Appellees acted deliberately from the circumstances and their actions. *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000). Thus, in *Costanich v. Dept. of Soc. & Health Svcs.,* 627 F.3d 1101,1113 (9th Cir. 2009) this Court, in holding that a jury issue as to judicial deception had been made out in opposition to motion for summary judgment, stated that "Resolution of disputed material facts is the special province of the factfinder."

As will be addressed, *infra,* the Appellees' argument for affirmance is grounded, without exception, on a set of facts contradicted by those in the record, and inferences drawn in favor of their position.

If this Court ignores these irrelevant, contradicted facts and inferences, the decision below must be reversed.

## II. TALAMANTES AND FRANCISCO HAVE FAILED TO PROVE ISSUE PRECLUSION

### A. Standard of Review

As to those actions constituting judicial deception, Arizona law controls whether any issue is precluded. Talamantes and Francisco fail to prove that (1) each specific representation and omission was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, and (3) resolution of the issue was essential to the decision. *Campbell v. SZL Properties, Ltd.,* 204 Ariz. 221, 223, ¶ 9 (App. 2003) (citation omitted).

We submit that the key to proper resolution of the question is that this Court focus on the record of *issues* adjudicated in the state court, not merely an agglomeration of testimony and documents proffered by Appellees from that case.

### B. The Court Should Decline to Consider Issue Preclusion

When the application of rules of preclusion would frustrate an overriding policy explicitly set out in the legislation giving rise to the claim at issue,

14

preclusion must give way to that substantive policy. *Ferris v. Hawkins,* 135 Ariz. 329, 333, 660 P.2d 1256, 1261 (Ariz. App. 1983) ("The judicial efficiency which can be obtained through application of principles of issue preclusion must give way where their rigid application would result in frustration of legislative purpose."); *Smith v. CIGNA HealthPlan of Ariz.,* 203 Ariz. 173, ¶ 21, 52 P.3d 205, 211 (App. 2002); *Circle K Corp. v. Industrial Comm'n,* 179 Ariz. 422, 425, 880 P.2d 642 (Ariz. App. 1993) ("The party is foreclosed from further litigation on the claim only when the policies justifying preclusion are furthered.").

Brian Wright seeks in this case not only to vindicate his and his son's constitutional rights, but to secure explicit decisional law that must guide future action by state actors tasked with exercising the comprehensive power to separate parent and child.

Congress enacted Section 1983 with an enforcement structure that relies upon the victims of constitutional violations to bring suit just for this purpose. Congress elevated the plaintiff's interest beyond that of a citizen in a private dispute. As the Supreme Court stated in the unfortunately titled case of *Newman v. Piggie Park Enterprises Inc*., 390 U.S. 400, 402 (1968) , 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968), "If a [civil rights] plaintiff obtains relief, he does so not for himself alone, but also as a private attorney general, *vindicating a policy that Congress considered of the highest priority*." (cleaned up, emphasis

15

added); *City of Riverside v. Rivera,* 447 U.S. 561, 574-75 (1986) ("When the citizen's day in court is denied him "the congressional policy that he seeks to assert and vindicate is denied him and the entire Nation, not just the individual.").

In the face of this overriding Congressional policy, the conflicting policy of dismissing cases simply to achieve judicial efficiency is weak indeed and must give way.

### C.   Securing the CAR: The Seventeenth Claim

A court speaks only through its rulings, that is axiomatic. If the Defendants were to find the evidence that the dependency court adjudicated the judicial deception questions to final order, it would be in the Under Advisement decision, 2 AER 087-102.[3]  But the May 28, 2021 decision neither addressed the specific falsehoods nor the omissions for decision in this case.

In this regard, the Court is urged to return to the teaching of *Costanich v. Dep't of Social and Health Services, supra*. *Costanich* stands, of course, as the seminal decision on liability of children's services agents for falsifying investigative files, reports and court documents. But *Costanich* was also ruled on

---

[3] In order to avoid confusion regarding references to the excerpts of record, and since Appellees used the same designative of ER volumes as Mr. Wright did, when this Brief references, say, 2 ER 165, that reference is to the Appelless' record. Citations to Appellees' excerpts will be __ AER ___.

16

issue preclusion. The panel affirmed denial of summary judgment, stating that

> The district court correctly held that the doctrine of collateral estoppel is inapplicable because the *issues* considered by the state courts and the administrative agency were not identical to those presented in this federal action…. The issue decided by the ALJ was whether substantial evidence supported the license revocation, while the issue decided by the state courtwas whether the review judge exceeded his authority in basing his factual findings on Duron's reports. By contrast, the question in *Costanich's* § 1983 suit is whether Duron deliberately fabricated evidence in her investigation. Even if the state court or the administrative agency addressed the truthfulness of Duron's reports, *neither decided whether Duron deliberately fabricated the evidence.*

*Id.,* at 1107, n. 10 (emphasis added).

The substance of Appellees' argument is that this Court should *infer* – from the chart of the claimed evidence -- that judicial deception was actually litigated if the issues *might have been decided* by the dependency judge. But that position was rejected not only in *Costanich,* but in *Dunkle v. Dale,* 668 Fed. Appx., 254, 255 (9th Cir. 2016), a case most definitely on point.

*Dunkle* anticipated this Court's holding in *Janjua v. Neufeld,* 933 F. 3d 1061, 1066-67 (9th Cir. 2019) ("that an issue is actually litigated *if it was implicitly raised* does not satisfy the test of issue preclusion.") (emphasis added). *Dunkle* came before this Court on grant of summary judgment for an investigator on allegations of judicial deception in securing assumption of custody by the children's services agency. That decision was reported at *Dunkle v. Dale,* 58 F. Supp. 3d 959 (D. Ala.

2014). As set out by the District Court, Dale directed exigent seizure of Dunkle's newborn child and then filed an *ex parte* petition seeking affirmance of custody because the child was a "Child in Need of Aid" ["CINA"] – equivalent to the CAR removal done here. 58 F. Supp. 3d at 962.

Mrs. Dunkle subsequently challenged the removal and custody in a preliminary hearing, at which the court heard testimony from Dale, affirmed the removal. Months later, following a trial, the court ordered that it was "contrary to the child's interest" to be returned to the mother. Following further proceedings, the court permanently severed Mrs. Dunkle's parental rights. *Id.*

In granting summary judgment on the defense of issue preclusion, the District Court grounded its holding on the assumption that judicial deception would "reasonably have been expected to be raised in the prior state court proceedings." *Id.,* at 966. The Court also justified summary judgment by holding that "Plaintiff also cannot challenge the evidence and testimony provided by Defendants without disputing the state court's decision which relied upon that evidence and testimony." *Id.,* at 967.

On appeal, this Court reversed. It most certainly recognized that what occurred in the dependency case subsequent to the issuance of the *ex parte* order plays no part in the analysis. Applying *Costanich's* reasoning, this Court held that

18

> [I]ssue preclusion does not bar Dunkle's claim that social worker Jennifer Dale fabricated four statements in her emergency petition to have A.F. declared a CINA. Although the court implicitly credited Dale's testimony in finding probable cause and subsequently adjudicating A.F. to be a CINA, the court was never asked to resolve and did not determine whether any of these four statements was fabricated. Moreover, the issues in the two proceedings are not identical for preclusion purposes simply because Dale's testimony was credited in the CINA proceedings.

> 668 Fed. Appx. at 255. *Deeths v. Lucile Slater Packard Children's Hospital,* 2013 U.S. Dist. LEXIS 83457 *33 (E.D. Cal. June 13, 2013) ("Although issues from the juvenile dependency proceedings may overlap into this action, the pivotal issues at stake here were not actually litigated and necessarily decided in the juvenile dependency proceedings."); *see, also, Galario v. Adewundmi*, 2009 U.S. Dist. LEXIS 38085 (D. Haw. May 1, 2009), rev'd other grounds, 531 Fed. Appx. 830 (9th Cir. 2010) (no preclusion of civil rights claim though removal litigated in family court).

The issue before this Court is indistinguishable from those before it in *Costanich* and *Dunkle.* The Under Advisement ruling does not adjudicate the specific misrepresentations and omissions. Indeed, there is not even a *mention* of the most damaging fabrication made by Appellees in the Application – carried forward into the Dependency Petition – that L.A.W. had suffered "serious or severe harm" at his mother's hands the night of December 15, 2020. That being true, the question of fabrication could not have been *necessary* to the outcome.

There can be no preclusive impact on the Seventeenth Claim.

19

### D.  The Nineteenth Claim Is Not Barred

As already addressed, the misrepresentations and material omissions were carried forward into the Dependency Petition, which resulted in the *ex parte* Temporary Orders.

Applying the preclusion elements, and reading the Under Advisement decision, it is abundantly clear that the juvenile judge did not test Defendants' allegations against the question of reckless or deliberate falsehood.

Hence, the resolution of the falsehoods and omissions alleged in the Nineteenth Claim was neither material, nor essential to, the finding of dependency.

The cases cited by Appellees for the contrary proposition are easily distinguished. It is revealing, indeed, that Appellees make no mention to *Costanich, Dunkle,* nor the other cases on point. In *Smith v. Banner Health Sys.*, 621 F. App'x 876 (9th Cir. 2015), the plaintiff did not sue for judicial deception in the securing of *ex parte* orders. It appears, rather, that plaintiff sued alleging due process violations in the entire dependency proceeding. That being the facts, plaintiff was challenging decisions made by the dependency court after a complete adjudication of the issues. *Smith* adds nothing to this Court's consideration.

*Kasdan v. County of Los Angeles,* 2014 U.S. Dist. LEXIS 165098 *12 (C.D. Cal. November 24, 2014), which post-dated *Costanich,* but made no mention of that controlling decision, pre-dated *Dunkle.* Like *Smith, Kasdan* is not on point. From

the decision, Kasdan's fabrication and suppression claims were made by him in petitions directed to the dependency court and fully heard before the court concluded no judicial deception had occurred. *Id.* at \*3. This alone distinguishes the case, but it is also apparent that the court made the same error in analysis that was later corrected by *Dunkle. Kasdan* stated that "during the juvenile dependency court's determination regarding the children's well-being, it was necessary to assess credibility and resolve disputes over who was telling the truth." *Id.,* at \*12. That may have been true, but the dispositive question was whether or not the dependency court adjudicated the existence of deliberate fabrications or omissions. That is not apparent from the ruling. *Kasdan's* analysis, for what it is worth, was repudiated by this Court. The decision was followed by *Dodson v. County of L.A.,* 2021 U.S. Dist. LEXIS 196977 (C.D. Cal., June 24, 2021). But that ruling was reversed by this Court in *Dodson v. Cnty. of Los Angeles,* 2022 U.S. App. LEXIS 23960 (9th Cir. August 25, 2019).

Finally, *Grimes v. Ayerdis,* 2018 U.S. Dist. LEXIS 132061 (N.D. Cal. August 6, 2018), is off point and unpersuasive. There were no *ex parte* orders issued, nor were the specifics of plaintiff's allegations of judicial deception identified, nor was there any citation to state court rulings addressing and concluding that the defendant did not recklessly nor intentionally engage in judicial deception. The only reference was to the state court finding that Ayerdis offered "extremely credible" testimony.

21

*Id.,* \*16. This absence of reasoning under *Constanich* renders the decision of no worth. Moreover, Grimes had previously filed two (2) federal cases alleging the judicial deception, and both had been dismissed with prejudice. *Id.,* at \*\*16-17. Dismissal on issue preclusion was no heavy lift.

In sum, Talamantes and Francisco's authorities are no authorities at all. This Court must hold that Appellees have failed to prove their affirmative defense.

### III. THE SUBSTANTIVE QUESTIONS: APPELLEES' EVIDENCE FAILS TO PROVE THE ABSENCE OF MATERIAL QUESTIONS OF FACT ON JUDICIAL DECEPTION

#### A. This Court Must Review the Appellees' Submissions in Their Totality: The Impact is Greater Than the Sum of Allegations Analyzed in Isolation

It bears repeating that by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning." *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), *quoting United States v. Stanert,* 762 F.2d 775, as amended, 769 F.2d 1410 (1985).

The corollary to that teaching, *Liston* went on to explain, is that the inclusion in an application of material exculpatory facts is "required to prevent technically true statements in the affidavit from being misleading." *Ibid.* Or, as this Court most recently, forcefully declared, "A statement can also be misleading if, although technically true, it has been so wrenched from its context that the judicial officer

22

will not comprehend how it fits into the larger puzzle." *Scanlon v. County of Los Angeles*, 92 F. 4th 781, 793 (9th Cir. 2024).

### B. The Duty of the Appellees to Uncover Facts Which Refute Allegations of Abuse, and Francisco's Integral Participation

Appellees, suggest that their failure to take steps to confirm or refute allegations before issuing the CAR Application -- such as the failure to interview Dr. Woolridge, interview Nursing Assistant Mendez, interview the child himself, or even visualize the alleged serious or severe injuries -- is immaterial because they had probable cause and they need not have gone further. While it is true that a police officer, having facts supporting probable cause, may arrest or seek a warrant, the responsibility imposed on DCS investigators by Arizona law demands more. A.R.S. §8-456(D)(1) directs that, upon receipt of an assignment, a DCS Specialist shall "[m]ake a prompt and thorough investigation" and "must evaluate and determine the nature, extent and cause of any condition created by the parents, guardian or custodian or an adult member of the victim's household that would tend to support *or refute the allegation* that the child is a victim of abuse or neglect…." (emphasis added).

Talamantes and Francisco not only concede that their obligation to investigate does not end with finding probable cause, but they also concede that the decision to remove and any subsequent decision to reverse that removal and return

23

the child to the parent *is Francisco's call.* See, e.g., 2 ER 070-71; 107-108; 121-122; 163-164.

Francisco must defend her integral participation in the filings.

### C. The Seventeenth Claim: Application for CAR: Misrepresentations and Material Omissions

Appellees argue to this Court that "Removal proceedings did not start until the family had failed to comply with a Present Danger Plan…" Brief, at 31. But in this, Appellees contradict their own previous sworn submissions. Talamantes has no recollection of any violation of the PDP. 2 ER 139-140. Indeed, in his Application, at 4 ER 662, Talamantes swore that the day after the PDP was imposed there was a meeting at which "the parents agreed to continue with the Present Danger Plan." The allegation that some violation of the PDP motivated the removal is no more than another red-herring laid to distract and mislead this Court. It bears no consideration, except as a caution to the Court in accepting any of Appellees' recitation of facts.

#### 1. There were no "multiple lesions" attributable to physical abuse and Talamantes and Francisco were reckless in the allegation.

In the CAR Application, Talamantes alleges a long history of physical abuse by Irlanda, then informs the judge that Woolridge's strip search/body cavity search of the child "documented [the child] *has multiple oval and linear contusions* to his inner thigh, hamstring, and buttock area. These lesions and contusions were noted

24

to *be inflicted* and in different stages of healing." 4 ER 662 (emphasis added). He does not inform the Judge that all but the single mark on the left hamstring that brought the child to the attention of law enforcement were innocuous "little boy bruises" the boy had had many times before – and on that same day. These "lesions" Dr. Woolridge of course testified were "superficial hyperemic lesions." Woolridge, in explaining what he meant when he wrote "inflicted," testified that that meant these marks could be the result of deliberate infliction, but also "are consistent with accidental play." 3 ER 382-388. When asked whether a reader of his report would misinterpret what he wrote as being Dr. Woolridge's opinion that deliberate action was the cause, he responded:

> "I don't think I'm talking to simply layman, nonmedical people. These are trained professionals who work for agencies and those agencies have been endorsed and trained internally on the communication and the processing of how to deal with any case like this. So, I am not specifically giving loose information that could be extrapolated, in my opinion, inappropriately." 3 ER 388 16-22.

Talamantes, being an experienced, trained Department specialist, no doubt knew that Woolridge had not ruled out accidental injury, which would require explanation to make the juvenile judge aware that it was not the investigator's conclusion that all the "multiple lesions" were the result of abuse.

In that Talamantes had no evidence that either parent had struck the child with any object on the night of the 15th, that the child denied knowing how he got

25

the only mark suggestive of abuse, and that the last time he recalled his mother spanking him with her hand was five days earlier, there was no evidence of any "pattern" of injuries.

This did not prevent Talamantes from summing up for the judge the devastating conclusion that "L.A.W.'s multiple marks and bruises on his body not only indicate a pattern which impacts the severity of the safety threat but also supports his statements during the forensic interview." 4 ER 663.

The Court can no doubt observe a compound misrepresentation in this: the reiteration of "multiple bruises and marks" coupled with the child's alleged report that Irlanda regularly beat him with objects – addressed *infra*. But, as we know, L.A.W. never reported that he was regularly beaten with objects – and there was no doubt that the hamstring bruise was sustained when some narrow object hit against his leg, or, perhaps, the child fell into it during roughhousing. It did not come from a mother's open hand spank.

What facts, then, have Talamantes and Francisco presented to persuade *this Court* that the representations and omissions did not mislead? None, actually. They write that the child having "other, typical childhood bruises" is a matter of "common knowledge that would not have materially impacted the Application." Brief, p. 27. But, of course, the judge reading the Application could not have discerned from the most definite allegations by Talamantes that all but one of the

26

marks was "immaterial" to whether or not immediate removal was *clearly necessary* to prevent future abuse.

This Court must conclude that the allegations regarding "multiple lesions" was misleading and materially so.

> ### 2. That L.A.W. "disclosed that his stepmother regularly uses physical discipline … [and] uses objects, to include the belt and a Hot Wheels racing track, to discipline him"

Appellees' only argument that this is not a misrepresentation is that "There is nothing inaccurate about using the term 'regularly' to describe something that happened *on numerous occasions.*" Brief, at 29 (emphasis added). Talamantes and Francisco double down on this throughout the Brief, for example, claiming that "[T]he child reported that Irlanda had hit him on *multiple occasions* with her open hand, a Hot Wheels track, or a belt. *Id* (emphasis added).

"Regularly" is defined in common use as "often" [Cambridge Dictionary] or "very often" [The Brittanica Dictionary]. It also means "customary, usual or normal." Taken together, the reader will understand from Appellees' words that Irlanda's customary and normal response to the child's regularly-occurring misbehavior was to go right to physical discipline of spanking with her hand, a belt or a piece of Hot Wheels track.

Appellees concede that L.A.W. repeatedly denied knowing how he got the single bruise that was not there when Ms. Mendez changed him the day before and

repeatedly denied it hurt. What, then, did Talamantes put in the CSRA, but omit from the Application, as to what L.A.W. had actually said about the history of discipline?

These are Talamantes' notes:

"[Child] said he had 'owie' on his leg but could not see it. Child denied knowing how he got it. Child had told [CVES nursing assistant Mendez] that the owie did not hurt and denied knowing how he got it.

The last time his stepmother hit him was *five (5) days* before, *with her hand* on the butt.

His stepmother "hit him with a hot wheels 'long thing' when he was *four.*

His stepmother hits him and his siblings on the butt with a brown belt. The last time this happened was when he was *five years old*.

Child stated his mother hits them with the metal part of the belt.

Child stated his father spanks his siblings and him on the butt with his hand. Child denied it hurts.

The child was asked, and he stated he feels safe at home."

4 ER 645-46 (emphasis added).

The child's responses undeniably do not even suggest that resorting to physical discipline was Irlanda's customary response to misbehavior. It certainly does not allow a reasonable "interpretation" that this happens often. Moreover, Talamantes possessed the reports from both parents and L.A.W.'s eight (8) year old sister that the parents' discipline practice was to take away things or give the

28

child a time out, and only sometimes spank with an open hand. 4 ER 646-647.

Like her brother, she denied any concerns for her safety.[4]

Talamantes likewise knew that the nursing assistant at CVES, a mandatory

reporter, had viewed the child's bottom and legs daily over the two (2) years he

was enrolled, and had never seen anything that concerned her for physical abuse.

None of L.A.W.'s actual statements, and none of the exculpatory evidence

was included so that the judge could draw his own conclusions. The Court must

conclude that the use of "regularly," when connected with the representation that

there was a "pattern" of deliberately inflicted, serious or severe injuries, without

inclusion of the exculpatory information, was misleading and materially so.

### 3. The allegation of an "on-going" investigation of Brian and Irlanda

It is undisputed that when he wrote up the Application, the only evidence

Talamantes had regarding the outcome of the Sahuarita Police investigation was

the Detail Incident Report written by Officer Carrizosa the evening of the 16th of

December – the first four (4) pages of Plaintiff's Exhibit 6, 2 ER 232-326.

---

[4] As part of this Court's consideration of the accuracy of the Appellees' representation of facts, they state this: "L.A.W. said that Irlanda had spanked him with her hand, a Hot Wheels track, and a belt; L.A.W.'s *siblings confirmed that spanking had occurred.* Brief, p. 29 (emphasis added). But this Court should recall that Appellees did *not* impose a safety plan for the three (3) other children, nor did they remove them. Yet, according to them, all the children were subject to abuse.

Talamantes concedes he received this on December 23rd. The Supplemental Narrative by Det. Johnston was not written until the day after Talamantes received Carrizosa's report. 2 ER 332-334.

*Both* narratives, Carrizosa's and Johnston's, report that the investigation is "closed." 2 ER 326, 334.

Talamantes and Francsico do not argue that the outcome of the investigation was immaterial. In that the investigation was far more extensive than anything Talamantes did and came to a conclusion directly contradictory to his reports, it cannot but be material. Appellees' only response is to ignore the actual language, that the investigation is *on-going*, ignore the conclusion reached by Det. Johnston as recorded by Officer Carrizosa, and argue that the investigation in fact was still open.

Talamantes' choice of the term "on-going" was clearly intentional. He was informing the judge that SPD had not yet reached any conclusion and was actively pursuing gathering evidence. No other implication is possible, and that statement is a flat misrepresentation of the only evidence Talamantes had.

Where is the evidence proffered by the Appellees that confirms without question that Talamantes, as of December 28th, believed the criminal liability of both parents was still an open question? Not in this record. In *this case,* as noted in the Opening Brief, Talamantes admitted to having no recollection of any

communications with SPD, and that, if he had had such communications, he would have documented them in the CSRA. See, e.g., 2 ER 068, 135, 144, 231. A perusal of that document, 2 ER 674-695, reveals no such entry. At *best*, Appellees attempt to raise an untimely justification that Talamantes made this material misrepresentation through a mistake of fact. But that only heightens the need for a jury to decide this question. This Court must conclude that Talamantes knew the investigation was closed but intentionally chose to mislead the judge.

### 4. The allegation that L.A.W. suffered "serious or severe harm" from "deliberate" acts of his stepmother

The Answering Brief gives but a lick and a promise to contesting this fundamental misrepresentation. Conceding, as they must, this allegation, their only response is that "[T]he Application also factually described the injuries, allowing the judge to draw her own conclusion." Brief, p. 30. But, of course as to the "injuries," the "factual description" was itself deceiving; Talamantes, having actually seen the child's condition as it was just hours after the examination in the images Brian texted to him, withheld this crucial exculpatory information; and also concealed that only the single hamstring mark was suggestive of abuse. And *none* of the marks were serious or severe.

Coupling this allegation with the allegation that *all* the "multiple lesions" were from deliberate action of Irlanda, Talamantes then spent the remainder of the Application piling on the confirmatory allegations.

One has to question, doesn't one, why the Appellees' claim, as to this representation, is that all is well because Talamantes quoted Woolridge's report to the judge; but, in defending the allegation that Irlanda "regularly" used objects in corporal punishment, argue there was no need to quote the child's actual words but only Talamantes' interpretation of the interview?

This Court must conclude that Talamantes' allegation of serious or severe harm caused by Irlanda's beatings creates a genuine issue of material fact that can only be resolved by a jury.

### 5. Brian's alleged concessions of the extent of injuries and Irlanda's responsibility

The *Scanlon* case, *supra,* is most certainly on point, but not for the reason cited by the Appellees. *Scanlon* came before this Court on appeal by the parents from an adverse ruling on summary judgment. This Court reversed. The Scanlon children were removed by the children's services defendants under a California removal statute that mirrors Arizona's. *Scanlon, supra,* 92 F. 4th at 793-794. Defendant Olarte prepared the application for an *ex parte* removal warrant and, the Scanlons argued, secured the order through judicial deception, the key to which

were the allegations that the children's teacher, a Ms. Turner, had corroborated allegations "that mother and father are treating child, minor [K.X.]'s autism with cannabis oil and have not consulted with a medical professional or a professional who deals with autism" which caused dangerous intoxication. *Id.,* at 793.

Turner denied the allegations attributed to her by Olarte in the application, which this Court found to be material because it was the only evidence that the child was intoxicated to a dangerous level. *Id.,* at 792. This Court, concluding that summary judgment was improperly granted, held that the comments put into the application attributable to Turner required a jury to determine whether this was reckless on Olarte's part: "To the extent the primary fact witness in Olarte's Statement of Cause (other than Olarte herself) did not report any negative behavioral effects from K.X.'s treatment, a reasonable trier of fact could find such misrepresentations were material to the issuance of a warrant to remove the children." 92 F. 4th 804. This Court further held that Olarte's allegation that the parents had not consulted a physician was a misrepresentation requiring resolution by a jury and cited Olarte's own contradictions in the application. *Id.,* at 801.

Here, Brian Wright's alleged reports to Talamantes regarding the child's injuries were given a very prominent part in the Application. Brian was the *only* witness to whom Talamantes and Francisco ascribed the concession that at least one injury was likely caused by Irlanda and purportedly gave an explanation of the

33

"lesions" he had seen. As in *Scanlon,* these statements attributed to Brian were clearly material. Brian denies he made such statements and testifies that he informed Talamantes of the history of bruises being consistent with the children roughhousing, omitted from the Application. This Court must hold that a jury is required to determine the truth of the Appellees' material allegations.

Appellees make much of Talamante's inclusion in the Application that Brian thought the mark that started it all might have come from L.A.W.'s brother hitting him with a Hot Wheels track. This, clearly, was to take the sting from the allegations at issue.

This illustrates the second lesson from *Scanlon.* A key allegation was that the Scanlon's had not consulted a physician before administering cannabis oil to K.X., and this Court found that Olarte included in the same report that the parents had told her the oil was prescribed by a doctor. *Id.,* at 801. This Court did not conclude that the inclusion of a true statement exonerated Olarte from the misrepresentation, but that it was evidence confirming the falsehoods. *Id.,* at 801-802.

The same is true in the instant case. As in *Scanlon,* Talamantes' inclusion of a true, but incomplete fact, allows the fact finder to conclude that Talamantes was, at a minimum, reckless.

It must be for a jury to decide.

34

### D.  The Nineteenth Claim: Judicial Deception in the Dependency Petition Filings

Talamantes and Francisco do not deny that all the key representations that secured the CAR order were carried into the Dependency Petition. Nor do they argue that the omissions were cured by inclusion in the Petition. Hence, a jury must determine whether the *ex parte* Temporary Orders were secured by judicial deception. Appellees argue that the inclusion of the allegation that the child had suffered serious physical injury in the care of his father cannot be laid to them because of prosecutorial independence. We cited *Beck v. Buckland,* 527 F.3d 853, 862 (9th 2008) for the proposition that the presumption is rebutted by evidence that fabricated evidence induced the prosecution. This Court has been clear that the presumption "does not bar a subsequent § 1983 claim against state or local officials who … knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy v. City of Adelanto,* 368 F.3d 1062, 1067 (9th Cir. 2004).

Here, the *only* source of the evidence from which the AG fashioned the Dependency Petition came from Talamantes. 2 ER 179-181 (Talamantes furnished to the AG a "Dependency Petition Worksheet" and the documents appended to the Petition). The presumption is rebutted.

## CONCLUSION

For the reasons set forth herein, and in the Opening Brief, Brian Wright respectfully submits that this Court must conclude summary judgment was improvidently granted, reverse the judgment in favor of Appellees and remand for trial on the merits.

Respectfully submitted,

*/s/Michael Garth Moore*
Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326 No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com
*Attorney for Appellant Brian Wright*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** | 24-6668

I am the attorney or self-represented party.

**This brief contains** | 8368 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　☐ it is a joint brief submitted by separately represented parties.

　　☒ a party or parties are filing a single brief in response to multiple briefs.

　　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Michael Garth Moore | **Date** | 6/30/25

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 30, 2025. Participants in the case who are registered CM/ECF users will be served via the appellate CM/ECF system.

Respectfully submitted,

*/s/Michael Garth Moore*
Michael Garth Moore (023742)

*Attorney for Appellant Brian Wright*